# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

| | |
|---|---|
| **RICARDO TORRES,** )<br>)<br>    **Plaintiff,** )<br>)<br>vs. )<br>)<br>**PRECISION INDUSTRIES,** )<br>**INC., a/k/a P.I., Inc.,** )<br>)<br>    **Defendant.** ) | No. 1:16-cv-01319-STA-egb |

## ORDER GRANTING DEFENDANT'S ORAL MOTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 52(c) FOR JUDGMENT ON PARTIAL FINDINGS

On December 19, 2016, Plaintiff Ricardo Torres initiated this diversity action by filing his Complaint against Defendant Precision Industries, Inc., a/k/a P.I., Inc. Plaintiff seeks relief under Tennessee law for what he alleges was a retaliatory discharge by Defendant because he sought to claim benefits under the Tennessee workers' compensation statute. On November 14, 2017, the Court denied Defendant's Motion to Dismiss and/or for Summary Judgment Based on the Statute of Limitations. The Court held a bench trial on March 26–27, 2018. At the close of Plaintiff's proof, Defendant moved under Federal Rule of Civil Procedure 52(c) for a judgment on partial findings, which the Court took under advisement. Then, in accordance with the Court's instructions, the Parties submitted proposed findings of fact and conclusions of law. The Court has considered the evidence presented at trial by Plaintiff, the Court's credibility determinations, the arguments of counsel, the relevant case law, and the entire record. For reasons set forth below, Defendant's oral Motion under Federal Rule of Civil Procedure 52(c) for judgment on partial findings is **GRANTED**.

## PARTIAL FINDINGS OF FACT

1. Plaintiff was born in Mexico and arrived in the United States illegally in 1997.

2. Plaintiff currently resides in Charlotte, North Carolina, and has lived there since December 2012.

3. Defendant is a manufacturer of high performance torque converters for automatic transmissions located in Whiteville, Tennessee, and incorporated under the laws of Nevada.

4. Defendant has been in business since July 1994 and employs around 18 to 20 employees.

5. Plaintiff began employment with Defendant on or about January 5, 2011, and was employed by Defendant until September 7, 2012.

6. During his employment with Defendant, Plaintiff was not legally authorized to work in the United States.

7. At the beginning of his employment, Plaintiff provided Defendant with a Social Security Number that, unbeknownst to Defendant, Plaintiff had not received from a United States government agency but had instead purchased on the streets of North Carolina for $120.

8. Defendant recorded the Social Security Number provided by Plaintiff in its payroll system and included the number in its tax filings but never received any feedback from a government agency suggesting that there was a problem with the number.

9. During Plaintiff's employment, Terry Hedrick, who was and remains Defendant's President and owner, was unaware that Plaintiff was not legally authorized to work in the United States.

10. Indeed, Mr. Hedrick was unaware that any of his employees were not authorized to work in the United States prior to Plaintiff's termination.

11. Plaintiff claims that he told Defendant's Production Manager, Craig Momberger, that Plaintiff was not legally authorized to work in the United States during his interview with Mr. Momberger in December 2010.

12. Mr. Momberger, however, claims that he did not discuss Plaintiff's immigration status during Plaintiff's interview but was told by Jesus Ruiz, then a friend of Plaintiff and an employee of Defendant, that Plaintiff was "legal."

13. Mr. Momberger did not fill out any form regarding Plaintiff's immigration status.

14. Mr. Momberger is not aware if any employee of Defendant filled out such a form.

15. In the early part of 2012, Mr. Hedrick received a letter in the mail advising him of a new law in Tennessee that would require Tennessee employers to review and check the documentation of every employee to make sure that he or she was legally authorized to work in the United States beginning in 2013.

16. This was the first time that Mr. Hedrick had knowledge of these specific legal requirements involving an employee's authorization to work in the United States.

17. Mr. Hedrick conducted a meeting in or about March 2012 to advise all employees of this new law.

18. Mr. Hedrick told employees that, beginning in November 2012, Defendant would require every employee to show their documentation.

19. Plaintiff attended the meeting conducted by Mr. Hedrick about the new law.

20. On September 8, 2012, Defendant terminated Plaintiff.

21. Plaintiff testified that he was injured while working for Defendant and was seeking workers' compensation benefits from Defendant when he was terminated.

22. In April 2013, four other employees of Defendant were terminated when they did not return to work with completed I-9 forms.

## CONCLUSIONS OF LAW

**1. The Court Has Subject Matter Jurisdiction**

In its oral Motion under Federal Rule of Civil Procedure 52(c), Defendant first challenges the Court's subject matter jurisdiction over this case. Although such challenge would have ideally been raised before now, subject matter jurisdiction is an issue of the Constitution's limitations upon the authority of the Court to preside over a matter and therefore may be raised at any time. *See* U.S. Const. art. III, § 2; *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."). Defendant specifically contests Plaintiff's invocation of diversity jurisdiction. Although the Constitution authorizes the federal judiciary generally to hear cases between citizens of different States or between a citizen of one State and a citizen of a foreign state, this Court's jurisdiction over diversity cases must be and is authorized by Congress. *See Sheldon v. Sill*, 49 U.S. 441, 449 (1850) (quoting *Turner v. Bank of N. Am.*, 4 U.S. 8, 10 (1799)) ("The political truth is, that the disposal of the judicial power (except in a few specified instances) belongs to Congress: and Congress is not bound to enlarge the jurisdiction of the Federal courts to every subject, in every form which the Constitution might warrant."). The relevant statute provides that

> [t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between—
> (1) Citizens of different States; [or]

> (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State . . . .

28 U.S.C. § 1332(a)(1)–(2). Plaintiff appears to be domiciled in North Carolina, regardless of his immigration status, and has been since this case was filed. *Cf. Gordon v. Steele*, 376 F. Supp. 575, 577–78 (W.D. Pa. 1974) (quoting *Krasnov v. Dinan*, 465 F.2d 1298 (3d Cir. 1972)) ("If the new state is to be one's home for an indefinite period of time, he has acquired a new domicile."). So for the Court's purposes here, Plaintiff is either considered a citizen of North Carolina or of a foreign state. And Defendant is a citizen of both Tennessee and Nevada. *See* 28 U.S.C. § 1332(c)(1). Thus, diversity in fact between the parties is established, and the only question is whether the amount in controversy exceeds $75,000.

Defendant claims that Plaintiff failed to meet his burden to establish the jurisdiction of the Court because, as a matter of law, Plaintiff is not entitled to the relief he seeks. The Court disagrees with the premise of Defendant's argument. The fact that a party may lose as a matter of law does not affect the amount that the suit has placed in controversy. For the law to require otherwise would result in an absurdity where federal courts could lose jurisdiction over any diversity case in which the defendants are entitled to judgment as a matter of law.

Here, Plaintiff's Complaint seeks *inter alia* backpay, compensatory damages, and punitive damages. Plaintiff valued his damages in excess of $76,000 at the time he filed his Complaint and presently asks for $45,708.42 in backpay, $75,000 in compensatory damages, and $70,000 in punitive damages. The Court does not reach the necessary evidence to evaluate these requests for the reasons discussed below, but Plaintiff introduced proof of the harm suffered at trial. Further, the Court finds that the amounts requested, based on the proof presented, were at

the very least calculated in good faith. Therefore, Plaintiff quite easily satisfies the amount-in-controversy requirement of diversity jurisdiction. And because the amount in controversy in this matter exceeds $75,000 and the parties are not citizens of the same State, the Court properly exercises jurisdiction over this case.

2. **Federal Law and Policy Preclude the Relief Sought by Plaintiff**

Plaintiff alleged and presented proof at trial that he was terminated from his employment with Defendant for making a claim under the Tennessee workers' compensation statute. But the Court makes no findings or conclusions as to the substance of Plaintiff's claim because, for reasons set forth below, the Court holds that federal law and policy embodied in the Immigration Reform and Control Act of 1986 ("IRCA") and articulated by the Supreme Court of the United States in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), preclude the relief sought by Plaintiff.

The Tennessee Workers' Compensation Law, Tenn. Code Ann. § 50-6-101 *et seq.*, generally provides that "[e]very employer and employee subject to this chapter, shall, respectively, pay and accept compensation for personal injury or death by accident arising primarily out of and in the course and scope of employment without regard to fault as a cause of the injury or death." Tenn. Code Ann. § 50-6-103(a). There is no dispute that, under Tennessee law as it presently stands, no consideration is given to an employee's legal authorization to work in the United States or lack thereof when that employee seeks relief under the Tennessee workers' compensation statute. *Silva v. Martin Lumber Co.*, 2003 Tenn. LEXIS 1047, at *5 n.2 (citing *Fed. Copper & Aluminum Co. v. Dickey*, 493 S.W.2d 463, 465 (Tenn. 1973); *Am. Sur. Co. v. City of Clarksville*, 315 S.W.2d 509, 513 (Tenn. 1958)); *Torres v. Precision Indus.*, 2014 Tenn. App. LEXIS 470, at *15–19 (Tenn. Ct. App. 2014). In fact, the statute specifically defines

"[e]mployee" as including those "lawfully or unlawfully employed." Tenn. Code Ann. § 50-6-102(12)(A). Although "Tennessee is an 'employment at will' state, meaning that an employee can be discharged without breach of contract for good cause, bad cause, or no cause at all. . . . , the Tennessee Supreme Court recognized an exception . . . in . . . a common law cause of action for retaliatory discharge to prevent employers from undermining the state's comprehensive workers' compensation legislation."[1] Pl. Ricardo Torres's Proposed Findings of Fact and Conclusions of Law, at 30, May 3, 2018, ECF No. 68 (citing *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 443–45 (Tenn. 1984)). And this "cause of action covers all employees regardless of immigration status." *Id.* (citing *Torres*, 2014 Tenn. App. LEXIS 470).

One of the doctrines at the heart of conflicts between federal and state law is preemption. "It is well established that within constitutional limits Congress may pre-empt state authority by so stating in express terms." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). But that is not the only method by which Congress may preempt state law.

> . . . Congress'[s] intent to supersede state law altogether may [also] be found from a scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.

*Id.* at 203–-04 (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982)) (internal quotation marks omitted). Immigration is one such field. As the Supreme Court noted,

---

[1] The Court finds that Plaintiff accurately states Tennessee law as to retaliatory discharge claims in his post-trial brief and reproduces his discussion here.

> [i]mmigration policy shapes the destiny of the Nation. On May 24, 2012, at one of this Nation's most distinguished museums of history, a dozen immigrants stood before the tattered flag that inspired Francis Scott Key to write the National Anthem. There they took the oath to become American citizens. These naturalization ceremonies bring together men and women of different origins who now share a common destiny. They swear a common oath to renounce fidelity to foreign princes, to defend the Constitution, and to bear arms on behalf of the country when required by law. The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here.

*Arizona v. United States*, 567 U.S. 387, 415–16 (2012) (citations omitted). Accordingly, "[t]he National Government has significant power to regulate immigration." *Id.* at 416; *see also* U.S. Const. art. I, § 8, cl. 4 (enumerating Congress's authority "[t]o establish an uniform Rule of Naturalization . . . throughout the United States"); *Trump v. Hawaii*, 585 U. S. ____, 2018 U.S. LEXIS 4026, at *53 (U.S. June 26, 2018) (citing *Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring)) (referencing "the political branches' broad power over the creation and administration of the immigration system"); *Lozano v. City of Hazleton*, 724 F.3d 297, 319 (3d Cir. 2013) (relying on "[t]he Supreme Court's recognition of the primacy of the national interest in regulations directly affecting aliens in this country"); *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012) (describing the issue of illegal immigration as an "area[] of overwhelming federal interest" in which the courts "must recognize the supremacy of federal law"). If state and federal policy conflict in regulating illegal immigration in the workplace, the State must yield. *See Martinez v. Lawhon*, 2016 Tenn. LEXIS 840, at *1–2, 27–28 (Tenn. Nov. 21, 2016) (citations omitted) (recognizing "Congress's exclusive constitutional power . . . to 'establish a[] uniform Rule of Naturalization' and that Congress had specifically occupied the field of regulation of immigration in the workplace in affirming the trial court's holding that part of the Tennessee Workers' Compensation Law was preempted by federal law).

Here, Defendant argues that federal law and policy preclude the award of backpay and damages sought by Plaintiff. In doing so, Defendant relies on the Supreme Court's interpretation of IRCA, and the federal policies embodied therein, and asserts that Plaintiff is not entitled to the relief he seeks. In *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 140 (2002), the Supreme Court vacated the National Labor Relations Board's (the "Board") award of backpay to an undocumented alien who had not been legally authorized to work in the United States because such relief was "foreclosed by federal immigration policy, as expressed by Congress in [IRCA]." The Supreme Court reasoned that such an award was "beyond the bounds of the Board's remedial discretion" because "awarding backpay to illegal aliens runs counter to policies underlying IRCA." *Id.* at 149; *see also Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc.*, 535 U.S. at 147) ("Congress enacted IRCA as a comprehensive framework for 'combating the employment of illegal aliens.'"). "Indeed, awarding backpay in a case like this," the Court stated, "not only trivializes the immigration laws, it also condones and encourages future violations." *Hoffman Plastic Compounds, Inc.*, 535 U.S. at 150. "It would [likewise] encourage the successful evasion of apprehension by immigration authorities [and] condone prior violations of the immigration laws . . . ." *Id.* at 151.

Defendant's main argument is that the *Hoffman* decision prohibits the Court from awarding Plaintiff backpay. Plaintiff correctly points out, however, that *Hoffman* was concerned with the award of backpay *by the Board* under the National Labor Relations Act (the "NLRA"). *Id.* at 142–48. Plaintiff also notes that the United States Court of Appeals for the Ninth Circuit expressed serious doubts that *Hoffman* was applicable to discrimination cases brought under Title VII because Title VII and the NLRA are completely different remedial schemes. *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1067–68 (9th Cir. 2004). The Court is inherently skeptical at first

glance that such a matter arising under not only a different remedial scheme but also a different sovereign could apply in this case. Strictly as a matter of precedent, the Supreme Court's holding did not expand beyond the Board. *See Sutton v. CHSPC, LLC*, 2018 U.S. Dist. LEXIS 111601, at *19 (W.D. Tenn. July 5, 2018) (quoting Bryan A. Garner, et al., *The Law of Judicial Precedent* § 4 (2016)) ("The *holding* of an appellate court constitutes the precedent, as a point necessarily decided."). But the Supreme Court was unequivocal in its conclusion that Congress did not "intend[] to permit [a situation] . . . where but for an employer's unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading apprehension by immigration authorities." *Hoffman Plastic Compounds, Inc.*, 535 U.S. at 149; *see also Pachecho v. Johnson*, 2017 WL 2880392, at *3 (M.D. Tenn. July 6, 2017) (declining to read *Hoffman* so narrowly as to only have applicability to the NLRA and the Board). And the Supreme Court's reasoning cannot be so easily discarded. *See Seminole Tribe v. Fla.*, 517 U.S. 44, 67 (1996) ("We adhere in this case, however, not to mere *obiter dicta*, but rather to the well-established rationale upon which the Court based the results of its earlier decisions."). Furthermore, even "mere *obiter dicta*" from the Supreme Court is virtually binding upon this Court. *See ACLU of Ky. v. McCreary Cty.*, 607 F.3d 439, 447–48 (6th Cir. 2010) (quoting *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002)) ("Lower courts are 'obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.'").[2]

---

[2] The Court is aware of no subsequent statement from the Supreme Court undermining *Hoffman*'s rationale. In fact, the high Court cited *Hoffman* positively this past term. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018) (quoting *Hoffman Plastic Compounds, Inc.*, 535 U.S. at 144). And sixteen years is hardly long enough to tarnish an opinion with age alone.

Immigration policy, even as it intersects with labor protections in the workplace, is, as is discussed above, an area squarely within the federal government's prerogative. Therefore, it is unsurprising that some, but by no means all, courts have expressed an openness to Defendant's position on this particular issue. For example, the Tennessee Court of Appeals conceded that "[s]ome damages available to U.S. citizens succeeding in labor and employment claims have been determined to be unavailable to unauthorized aliens."[3] *Torres*, 2014 Tenn. App. LEXIS 470, at *27–28 n.8 (citing *Hoffman Plastic Compounds, Inc.*, 535 U.S. 137); *cf. Affordable Hous. Found., Inc. v. Silva*, 469 F.3d 219, 244 (2d Cir. 2006) ("New York's Court of Appeals has by no means indicated that it would approve a § 240(1) lost earnings award to an undocumented alien who procured employment by criminally violating IRCA."). But Plaintiff argues against this conclusion by relying on *Pontes v. New England Power Company*, 2004 WL 2075458, at *3 (Mass. Super. Aug 17, 2004). There, the Massachusetts court reasoned that applying *Hoffman* to deny the award of backpay or related damages actually incentivizes employers to hire illegal immigrants for the specific purpose of avoiding liability in the future. *Id.* Thus the Court, according to Plaintiff, would run afoul of the federal policies underlying IRCA if it declined to award backpay or damages on the basis of *Hoffman*. But in applying *Hoffman* to preclude the relief sought in this case, the Court would not act contrary to IRCA for the very reason raised by Plaintiff in his other argument: that damages should nonetheless be awarded in this case because Defendant was aware of Plaintiff's immigration status when it hired him. This second argument is soundly reasoned. The United States Court of Appeals for the Second Circuit held that there

---

[3] The Tennessee Court of Appeals did, however, limit this statement. *See Torres*, 2014 Tenn. LEXIS 470, at *28 n.8 (quoting *Chopra v. U.S. Prof'ls, LLC*, 2005 WL 280346, at *3 (Tenn. Ct. App. Feb. 2, 2005)) (citing *Singh v. Jutla*, 214 F. Supp. 2d 1056, 1061 (N.D. Cal. 2002)) ("*Hoffman* 'did not foreclose "traditional remedies" sufficient to effectuate national labor policy regardless of whether the "spur and catalyst" of backpay accompanies them'; thus, leaving available other forms of redress an illegal immigrant may be entitled in that context.").

11

was no conflict between New York law and federal immigration policy as expressed in IRCA when awarding compensation for lost earnings if "it was the employer and not the worker who violated IRCA by arranging for employment." *Affordable Hous. Found., Inc.*, 469 F.3d at 228. The United States District Court for the Middle District of Tennessee likened this reasoning "to an unclean hands theory, by which an employer defendant waives its right to raise the issue of the plaintiff's unemployability in the United States in order to avoid recovery of lost future wages." *Pacheco*, 2017 WL 2880392, at *4. Limiting *Hoffman*'s applicability to employers that are unaware of their employees' immigration status serves a dual purpose. First, it alleviates concerns that an employer might abuse immigration policy by knowingly hiring individuals unauthorized to work in the United States with the intent of avoiding certain liabilities down the road. And second, it maintains a consistency with federal immigration policy by ensuring that employers do not profit from their own violations of IRCA.

But here, the Court cannot conclude that Defendant is a culpable party. Mr. Hedrick's testimony was credible, and he testified that he was unware of Plaintiff's immigration status until after he terminated Plaintiff. Further, the conflicting testimony as to whether Mr. Momberger was aware of Plaintiff's immigration status is at best inconclusive. Mr. Momberger merely utilized the Social Security Number provided by Plaintiff with no apparent issue. And if Mr. Hedrick was not aware of a need for further documentation, as he credibly testified, there is no reason to suspect that Mr. Momberger was aware of such a need. Finally, the proof offered by Plaintiff as to the four employees that were subsequently terminated after not completing I-9 forms is not helpful here. Mr. Hedrick's apparent suspicions at that point are subsequent to the events of Plaintiff's termination and therefore outside the scope of the Court's inquiry. From these facts, the Court has determined that Defendant was unaware of Plaintiff's immigration

status. Therefore, the limitation does not apply in this case, and Plaintiff's arguments are unpersuasive. Without any indication that Defendant sought to violate federal immigration policy by employing Plaintiff despite knowledge of his immigration status, the Court would not offer Defendant or other employers a perverse incentive to violate IRCA by denying Plaintiff the relief he seeks.

The Supreme Court's reasoning in *Hoffman* echoes far beyond the pages of the NLRA, and as a trial court under the jurisdiction United States Court of Appeals for the Sixth Circuit, this Court is bound to apply that reasoning. Under the Supreme Court's logic, the Court cannot see why IRCA would permit Plaintiff to receive the backpay and damages that stand in the place of the employment benefits he was allegedly owed under Tennessee law when those benefits stem from an unlawful employment relationship. State concerns of labor protections quite simply must yield to federal immigration policy. The Court therefore concludes that an award of backpay for a lost job that Plaintiff was not permitted to have in the first place runs counter to IRCA and *Hoffman*.

Defendant also challenges Plaintiff's ability to receive compensatory and punitive damages on different grounds in its post-trial brief. But when orally making its Motion before the Court, Defendant extended the logic of its main argument to Plaintiff's request for damages. Defendant maintained that, because they stem from the same loss of employment that would trigger the award of backpay, damages are likewise inappropriate under *Hoffman* and IRCA. The Court agrees. It finds the possibility of awarding compensatory or punitive damages to be a glaring inconsistency that would merely circumvent and ultimately run contrary to federal policy. After all, the purpose of compensatory damages is to make the plaintiff whole. *See Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 902 (Tenn. 1992) ("The trier of fact shall be

13

further instructed that . . . the purpose of compensatory damages is to make plaintiff whole."). But making Plaintiff "whole" in this case would involve using a monetary award to return him approximately to the position he was in before the allegedly retaliatory termination—a position Plaintiff was not permitted to be in under federal law. And while Plaintiff's allegations might have entitled him to punitive damages if he established Defendant's conduct as particularly egregious, Tennessee law requires some sort of relief accompanying the punitive damages, whether it be injunctive relief, compensatory damages, or even nominal damages. *Clemons v. Cowan*, 324 S.W.3d 528, 533 (Tenn. Ct. App. 2010) ("[A]fter the jury initially returned a verdict for punitive damages with no compensatory damages, the trial court erred by failing to instruct the jury as to nominal damages."); *Hodges*, 833 S.W.2d at 902 (stating that "the primary purpose of a punitive award is to deter misconduct"); *Oakley v. Simmons*, 799 S.W.2d 669, 672 (Tenn. Ct. App. 1990) (quoting Hutchison v. Pyburn, 567 S.W.2d 762, 765 (Tenn. Ct. App. 1977)) ("We are of the opinion that the rule so long recognized in Tennessee is, as this court in *Hutchison* suggested, 'really a roundabout way of saying that there can be no cause of action for punitive damages alone.' Where the plaintiff has proved an entitlement to injunctive relief, an award of punitive damages may be upheld without an award of compensatory damages."). Plaintiff is, however, entitled to no such relief.[4] Furthermore, it would remain difficult to justify a circumvention of federal policy simply to punish a defendant. The Court would still have to ultimately award the punitive damages on Plaintiff's retaliatory discharge claim. And any award ultimately based in that claim would remain contrary to federal law because it arose from an illegal employment relationship.

---

[4] Plaintiff initially requested reinstatement as a remedy alongside backpay and the various forms of damages in his Complaint, but he did not mention reinstatement at trial or in his proposed findings of fact and conclusions of law. Accordingly, the Court considers Plaintiff to have abandoned this request.

As it considers the Supreme Court's reasoning in *Hoffman*, the Court cannot see why Plaintiff would be entitled to employment benefits under Tennessee's Workers' Compensation Law in the first place since, absent the allegedly retaliatory conduct of Defendant, Plaintiff would have continued working illegally and evading detection by immigration authorities. If IRCA prohibits the award of backpay for an employer's retaliatory discharge of an illegal immigrant under the NLRA in order to avoid incentivizing illegal immigration, then would it not prohibit the State of Tennessee from mandating the provision of workers' compensation benefits to an illegal immigrant for the same reason? The Tennessee Supreme Court has stated that the Tennessee workers' compensation statute's "purpose[] . . . [is to] secur[e] benefits to those workers who fall within its coverage." *Lindsey v. Smith & Johnson, Inc.*, 601 S.W.2d 923, 925 (Tenn. 1980). But in securing those benefits to certain workers, the State requires employers to provide individuals illegally present in the United States with workers' compensation benefits. Such a mandate brushes if not outright intrudes upon an area of law that is fully occupied by the powers of the federal government. If "IRCA 'forcefully' made combating the employment of illegal aliens central to 'the policy of immigration law,'" *Hoffman Plastic Compounds, Inc.*, 535 U.S. at 147 (quoting *INS v. Nat'l Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 & n.8 (1991)), then a labor policy permissive of and incentivizing such employment by providing persons who were unlawfully employed with benefits stands athwart the federal policy. *See Reinforced Earth Co. v. Workers' Comp. Appeal Bd. (Astudillo)*, 810 A.2d 99, 111 (Pa. 2002) (Newman, J., dissenting) ("The preferable course is to announce, as a matter of public policy consistent with federal immigration law, that unauthorized aliens are not eligible for workers' compensation benefits. One who obtains employment in a manner contrary to federal law should not benefit from that illegal employment relationship."); *Dowling v. Slotnik*, 712 A.2d 396, 415–

16 (Conn. 1998) (quoting *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 481 (1991)) (McDonald, J., dissenting) ("[E]mployment benefits are an incentive for illegal immigrants to enter or remain in this country. Whatever effect requiring those hiring illegal aliens to pay workers' compensation benefits may have . . . , it cannot be disputed that our decision confers employment benefits on illegal aliens. In doing so, it obviously makes employment in this country more attractive. . . . , [which] does clear and manifest damage to the goal of Congress to stem the 'vast tide of illegal immigration' resulting in 'literally millions of undocumented aliens in the United States.'"). Likewise, the Tennessee court-made doctrine of permitting individuals who secured employment unlawfully to nonetheless pursue workers' compensation claims would also seem to be contrary to federal policy, insofar as the doctrine relates to those who secured employment despite lacking legal authorization to be present in the United States. *Cf. Martin Lumber Co.*, 2003 Tenn. LEXIS 1047, at *5 n.2 (quoting *Dickey*, 493 S.W.2d at 465) ("[T]he Tennessee Supreme Court has recognized that 'employment which has been obtained by the making of false statements-whether by a minor or an adult, is still employment; that is, the technical illegality will not of itself destroy compensation coverage.'"). But these issues are not before the Court today because Defendant has not raised the issue of preemption. The Court is faced with only the limited question of whether IRCA and *Hoffman* preclude the award of backpay and related damages to an employee who was working illegally because the employee was not authorized to be present in the United States. The Court holds that they do. And the Court further holds that punitive damages are inappropriate in this case, if not generally so under IRCA and *Hoffman*.

Because Plaintiff is not entitled to relief, Defendant's oral Motion under Federal Rule of Civil Procedure 52(c) must be, and therefore is, **GRANTED**.

# CONCLUSION

For the foregoing reasons, Court first holds that it has subject matter jurisdiction under 28 U.S.C. § 1332(a) in this case. But because the Court also holds that the federal policies embodied in IRCA and articulated in *Hoffman* foreclose the award of backpay and other damages sought by Plaintiff, the Court cannot grant Plaintiff the relief he seeks in his retaliatory discharge claim. The Court further holds that Plaintiff is not entitled to punitive damages under Tennessee law because Plaintiff is not entitled to any other relief sought. Alternatively, the Court holds that punitive damages are also unavailable to Plaintiff under the federal policies embodied in IRCA and articulated in *Hoffman*.

Therefore, Defendant's oral Motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c) is hereby **GRANTED**. The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: July 19, 2018.