**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RICARDO TORRES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-01319-STA** |
| | ) | |
| **PRECISION INDUSTRIES, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON REMAND

This matter comes before this Court on remand from the Sixth Circuit Court of Appeals. After a two-day bench trial on the matter, the Court granted Defendant's oral motion for judgment on partial findings ("*Torres I*") and entered judgment in favor of Defendant on July 19, 2018. (ECF Nos. 72, 73.) This Court held that federal law and policy embodied in the Immigration Reform and Control Act of 1986 ("IRCA") and articulated by the Supreme Court of the United States in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), precluded the relief sought by the Plaintiff under Tennessee Workers' Compensation Laws and Tennessee case law for a retaliatory discharge claim. (ECF No. 72 at p. 6.)

Plaintiff then filed a Notice of Appeal with the Court on August 13, 2018. (ECF No. 74.) The Sixth Circuit entertained briefing from the parties on the issue of preemption and issued an Order on September 6, 2019, vacating the Court's Judgment in *Torres I*. (ECF No. 80.) The Sixth Circuit held that the Court erred in holding that federal law preempted state law before first deciding whether Defendant had violated Tennessee law and remanded the matter. (*Id.* at p. 5.)

On remand, the district court should decide whether Precision violated Tennessee law. If the answer is no, then neither the district court nor our court will need to address the question presented by this appeal. If the answer is yes, however, then the district court will also have to determine the appropriate remedy. The court should decide what remedies are available under Tennessee law before resolving whether federal law preempts any of those remedies.

(*Id.* at 5–6.)

This Court requested that the parties file notice of whether they believed any additional briefing or argument would be required in light of the Sixth Circuit's ruling. (ECF No. 82.) The parties filed a Joint Statement alerting the Court that they would rely upon their Appellate Briefs regarding the issue of preemption and that otherwise no further briefing or argument would be necessary. (ECF No. 83.) Thus, as directed, the Court will consider the record and transcripts from the bench trial (ECF Nos. 65, 66) and the Parties' Proposed Findings of Fact and Conclusions of Law (ECF Nos. 67, 68) to determine whether Defendant retaliated against Plaintiff for claiming benefits under the Tennessee Workers' Compensation statute in violation of Tennessee law, the available remedies, and whether those remedies are precluded by federal law.

## PARTIAL FINDINGS OF FACT IN *TORRES I*

1. Plaintiff was born in Mexico and arrived in the United States illegally in 1997.

2. Plaintiff currently resides in Charlotte, North Carolina, and has lived there since December 2012.

3. Defendant manufactures high-performance torque converters for automatic transmissions. Defendant is located in Whiteville, Tennessee, and is incorporated under the laws of Nevada.

4. Defendant has been in business since July 1994 and employs around 18 to 20 employees.

5.      Plaintiff began employment with Defendant on or about January 5, 2011, and was employed by Defendant until September 7, 2012.

6.      During his employment with Defendant, Plaintiff was not legally authorized to work in the United States.

7.      At the beginning of his employment, Plaintiff provided Defendant with a Social Security Number that, unbeknownst to Defendant, Plaintiff had not received from a United States government agency but had instead purchased on the streets of North Carolina for $120.

8.      Defendant recorded the Social Security Number provided by Plaintiff in its payroll system and included the number in its tax filings but never received any feedback from a government agency suggesting that there was a problem with the number.

9.      During Plaintiff's employment, Terry Hedrick, who was and remains Defendant's President and owner, was unaware that Plaintiff was not legally authorized to work in the United States.

10.     Indeed, Mr. Hedrick was unaware that any of his employees were not authorized to work in the United States prior to Plaintiff's termination.

11.     Plaintiff claims that he told Defendant's Production Manager, Craig Momberger, that Plaintiff was not legally authorized to work in the United States during his interview with Mr. Momberger in December 2010.

12.     Mr. Momberger, however, claims that he did not discuss Plaintiff's immigration status during Plaintiff's interview but was told by Jesus Ruiz, then a friend of Plaintiff and an employee of Defendant, that Plaintiff was "legal."

13. Mr. Momberger did not fill out any form regarding Plaintiff's immigration status, including an I-9 form.

14. Mr. Momberger is not aware if any employee of Defendant filled out such a form.

15. In the early part of 2012, Mr. Hedrick received a letter in the mail advising him of a new law in Tennessee that would require Tennessee employers to review and check the documentation of every employee to make sure that he or she was legally authorized to work in the United States beginning in 2013.

16. This was the first time that Mr. Hedrick had knowledge of these specific legal requirements involving an employee's authorization to work in the United States.

17. Mr. Hedrick conducted a meeting in or about March 2012 to advise all employees of this new law.

18. Mr. Hedrick told employees that, beginning in November 2012, Defendant would require every employee to show their documentation.

19. Plaintiff attended the meeting conducted by Mr. Hedrick about the new law.

20. On September 8, 2012, Defendant terminated Plaintiff.

21. Plaintiff testified that he was injured while working for Defendant and was seeking workers' compensation benefits from Defendant when he was terminated.

22. In April 2013, four other employees of Defendant were terminated when they did not return to work with completed I-9 forms.

## ADDITIONAL FINDINGS OF FACT

*Retaliation Claim*

23. Mr. Momberger was the Production Manager, and Cheri Norwood was the Office Administrator/Safety Manager responsible for tasks such as handling workers' compensation claims.

24. Ms. Norwood was given no training on Tennessee workers' compensation law prior to assuming responsibility for those claims.

25. Plaintiff started as a parts maker, later became a welder, and then became a converter builder.

26. Adriana Chavira trained Plaintiff.

27. On May 17, 2012, Plaintiff injured his back at work by attempting to hold on to a part.

28. When an employee is injured at work, Precision's policy is for Ms. Norwood to file a claim and provide the employee with a list of approved doctors.

29. On May 17, 2012, Plaintiff attempted to report his injury to Ms. Norwood but was unsuccessful, as she was on the phone.

30. On May 18, 2012, when Plaintiff reported his injury to Ms. Norwood, she asked him about his pain, and she filled out the proper paperwork.

31. Ms. Norwood scheduled Plaintiff an appointment at Whiteville Clinic for that day, and Plaintiff received a work excuse for the remainder of the week.

32. The Employee Manual in effect at the time of Plaintiff's injury, dated June 29, 2012, states in part, "Employees returning to work after being absent due to a work-related injury must report to the Human Resource Manager prior to beginning work and must bring a doctor's clearance for returning to work."

33. On May 29, 2012, Plaintiff returned to work without a release from his doctor.

34. Mr. Momberger and Ms. Norwood requested the release but never received it, but Plaintiff continued to work.

35. Plaintiff testified that, although he had returned to work, his back injury had not healed, and the pain worsened.

36. Plaintiff claims that he reported the pain to Ms. Norwood several times and requested another doctor's appointment.

37. Plaintiff never returned to the Whiteville Clinic.

38. Plaintiff scheduled his own appointment to go to a doctor in Memphis for his back in June or July of 2012. He attended on August 7, 2012, and received a bill.

39. The doctor in Memphis referred Plaintiff to a specialist for an MRI.

40. On August 24, 2012, Plaintiff recorded his conversation with Ms. Norwood regarding the medical bills generated by his doctor's appointment in Memphis and the results of his MRI. Ms. Norwood stated, "You didn't tell me you were hurt again," "You didn't notify me or Craig, so we have no way to verify that it actually happened here. I can't turn this into workers' comp," and "There won't be a workers' comp claim on this." Ms. Norwood indicated that the claim was closed without verification from the workers' compensation insurance company.

41. On September 6, 2012, Plaintiff met and retained Attorney John Fields to pursue a workers' compensation claim.

42. On September 7, 2012, at 10:00 a.m., Ms. Norwood received a call from Plaintiff's attorney requesting information regarding Plaintiff's workers' compensation claim.

43. Ms. Norwood told Plaintiff's attorney that Plaintiff's May 2012 workers' compensation claim was closed.

44. Ms. Norwood went to Mr. Momberger, and they decided to speak to Plaintiff about the call. The "heated" exchange occurred at approximately 10:30 a.m. Plaintiff surreptitiously recorded the conversation. Ms. Norwood repeatedly stated that Torres did not tell her that he was hurt again and threatened to "knock the hell out of" Plaintiff. Mr. Momberger said,

> Now that you got a fucking lawyer involved. Good luck on that son of a bitch . . . I don't even get why the fucking lawyer's involved. Why? You trying to do something? . . . You think that we have to pay for that . . . I'm going to show you a lot of goddamn loyalty if that's the way you fucking do things . . . When Terry finds out about this shit, you're in a world of hurt."

45. After the conversation, Ms. Norwood called Ms. Vicki Hedrick, and Mr. Momberger called Mr. Terry Hedrick. Mr. Momberger told Mr. Hedrick that Plaintiff's "actions had strong implications against the company" and recommended his termination.

46. On September 7, 2012, after the phone call from Mr. Momberger, Mr. Hedrick fired Plaintiff. Mr. Hedrick did not know at that point that Plaintiff had retained an attorney. Mr. Momberger told Plaintiff to "get the fuck out of here . . . You know very well why. Get your shit together and get out."

47. Plaintiff's separation notice stated that the reason for separation was "Lack of Work." Mr. Hedrick agreed that this was not an accurate reason.

48. On September 10, 2012, Mr. Hedrick wrote a letter to Defendant's workers' compensation carrier to inform them that Plaintiff's claim was "bogus." Regarding the events of August 24, 2012, and September 7, 2012, he wrote,

> On August 24, 2012, while I was out of town, [Plaintiff] proceeded to tell my human resources manager that he had doctor bills to pay and he wanted money. He

was told that the company had insurance and that would be his only avenue to reimbursement if there was to be any because there was not an open claim. . . . On September 7, 2012, again while I was out of town he went to the human resource manager demanding money only this time his whole objective was to cause a chaotic scene by upsetting both the human resource manager and his immediate supervisor who were trying to calm him down. I was contacted by his immediate manager and apprised of what was going on with his demands. At that time to deflate the situation and stop the disruption to my business I instructed his immediate supervisor to terminate his employment immediately.
…
I find his actions illogical and childish because he knew we had workers comp insurance . . . According to my employees because he is an illegal alien and knew his last day of employment with my company would be November 15, 2012 if he did not have his immigration paperwork in order. I think he [sic] if he could get a workers comp claim going then I would not be able to terminate his employment.

49. Mr. Hedrick testified that the "majority" of the letter is true, except that he exaggerated by stating that Defendant has a human resources manager—Ms. Norwood was never a human resources manager.

50. Mr. Hedrick admitted that he continued to employ Luis Chavira, Jesus Ruiz, Julio Rodriguez, and Jose Carrizales until April 30, 2013, despite their inability to fill out the I-9 form required by law.

51. On April 8, 2013, in response to Interrogatory Number 5 from the initial state court action, Defendant stated the following as reasons for Mr. Torres' termination:

Terry Hedrick ("Hedrick") perceived Torres as a disruptive negative force and he simply had had enough. Torres had wrecked the marriage between two of Defendant's employees, Jesus Ruiz and Adriana Chavira . . . Torres was not a productive worker and for that reason was not given a raise . . . On September 7, 2012, Hedrick was out of town, and contacted by telephone by Craig Momberger and told that Torres had upset Cheri Norwood by demanding we pay his medical bills for which the Company was not responsible, and then threatening to sue with an attorney. This was perceived by Hedrick as an attempt by Torres at extortion . . . Before September 7, 2012, Hedrick was already considering terminating Torres because of his worsening performance and attitude. Torres had also been caught stealing from Precision in the past. When Hedrick heard on September 7th that Torres was causing further disruption Hedrick made the decision to terminate him. It was like the last straw.

52. On August 15, 2017, in response to Interrogatory Number 3 for this federal action, Defendant stated identical reasons.

53. Mr. Hedrick affirmed that those were the reasons he terminated Plaintiff.

54. On May 14, 2011, Plaintiff received an "Employee Performance Evaluation" from Mr. Momberger, in which Mr. Momberger recorded Plaintiff's performance as "above average" in each of twelve factors.

55. The Evaluation included the following factors: availability, adherence to policy, behavior pattern, creativity, dependability, independence, initiative, interpersonal relationships, knowledge of job, productivity, and quality.

56. Mr. Momberger had a procedure whereby he would issue written warnings for performance issues, and those disciplinary reports would be placed in the employee's personnel file.

57. Plaintiff's file contained no written warnings.

58. Even if Plaintiff had been involved in the theft of aluminum stators from Defendant, it occurred in 2011 while he was living with Adriana Chavira and Jesus Ruiz. No discipline resulted.

59. Even if Plaintiff was responsible for breaking-up Ms. Chavira and Mr. Ruiz, that also occurred in early 2011. No discipline resulted.

60. No documentation supports the reasons listed for Plaintiff's termination.

*Damages*

61. Defendant paid Plaintiff $12 per hour, and Plaintiff worked 40 hours per week for Defendant before he was terminated.

62. Plaintiff testified that he would have earned $89,440 between his termination and his employment at Delane Construction in July 2016.

63. Plaintiff and Defendant stipulate that between December 6, 2012, and July 2016, Mr. Torres' gross earnings were $43,731.58.

64. Plaintiff did not see a therapist after his termination but did receive counseling from the priest at Santa Maria Church.

65. Plaintiff felt stressed, depressed, and frustrated after his termination due to the nature of his termination and his interactions with Ms. Norwood and Mr. Momberger.

66. Plaintiff did not apply to any manufacturing facilities between his termination on September 7, 2012, until he applied to a furniture factory in Southaven, Mississippi, at some point in early December.

67. Plaintiff moved back to North Carolina in late December of 2012.

68. Plaintiff received work authorization in February of 2013.

69. Plaintiff did part-time janitorial work and held a temporary restaurant job from February to May of 2013, earning between $700 and $1,200.

70. Plaintiff worked for Ambassador Personnel and was placed at Edsco Co., earning $9,128.82 between May and October of 2013.

71. Plaintiff lost that placement when a coworker attacked him with a knife.

72. Ambassador Personnel did not relocate Plaintiff.

73. Plaintiff gained employment with Naman Lakepoint, LLC, a Hilton Garden Inn, "for a couple of months" and earned $726.20 in 2013.

74. Plaintiff gained employment with Carolina Auto Machine in 2014, then quit.

75.    Plaintiff was unemployed for a period of four to five months in 2014 wherein he did "little cash jobs" but did not seek any manufacturing jobs.

76.    In July of 2016, Plaintiff gained employment with Delane Construction.

## RETALIATORY DISCHARGE CLAIM

For the reasons discussed below, this Court finds that Defendant Precision Industries fired Plaintiff Torres in retaliation for filing a workers' compensation claim in violation of Tennessee law.

In Tennessee, "an employee or an employer may terminate an employment-at-will relationship at any time, with or without good cause." *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995) (citing *Forrester v. Stockstill,* 869 S.W.2d 328, 330 (Tenn. 1994); *Chism v. Mid-South Milling Co.,* 762 S.W.2d 552, 555 (Tenn. 1988)). In *Clanton v. Cain-Sloan Co.,* 677 S.W.2d 441 (Tenn. 1984), however, the Court carved out an exception to this rule and held that an action in tort for retaliatory discharge is available to a person whose employment has been terminated for asserting a claim for workers' compensation benefits.

The analytical framework for a retaliatory discharge case, in general, was established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Pursuant to this framework, the plaintiff employee must first prove his or her prima facie case of retaliation, thereby creating "a rebuttable presumption that the employer unlawfully . . . retaliated against him or her." *Williams v. City of Burns*, 465 S.W.3d 96, 112 (Tenn. 2015) (quoting *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 780 (Tenn. 2010)). The employer then assumes the burden of production to demonstrate a legitimate, nonretaliatory reason for the termination. *Id.* If the employer satisfies that burden, the employee then has the chance to prove by a preponderance of the evidence that the reasons offered by the employer were a mere pretext. *Id.*

## A. Prima Facie Case

Under Tennessee law, a plaintiff must establish the following elements to establish a prima facie claim for retaliatory discharge: "(1) The plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment." *Conatser*, 920 S.W.2d at 648 (citing *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993)). The first three elements are not in dispute.

What remains to be determined is whether Plaintiff's claim for workers' compensation benefits was a substantial factor in Defendant's motivation to terminate Plaintiff's employment. An employee "must show either direct or circumstantial evidence of a causal connection" between his workers' compensation claim and Defendant's terminating him. *Canady v. Gillette Co.*, 547 F. App'x 670, 679 (6th Cir. 2013) (citing *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992); *see also Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006) (quoting *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999)) ("Thus, a plaintiff may prove causation 'by presenting direct evidence of the necessary causal link or by introducing compelling circumstantial evidence of such a link.'"). Circumstantial evidence to consider includes but is not limited to the following:

(1) temporal proximity of the adverse action to the complaint;[1] (2) a pattern of workplace antagonism following a complaint; (3) an employer's failure to adhere to established

---

[1] The weight courts should give the temporal proximity of the workers' compensation claim to the discharge of the employee has been subject to much debate. *See generally Thayer v. Tyson Foods, Inc.*, No. 07-1214B, 2009 WL 10699768, at *3–*5 (W.D. Tenn Jan. 23, 2009) (outlining the progression of the law on this point). The Tennessee Supreme Court held in *Conaster v. Clarksville Coca-Cola Bottling Company* that temporal proximity, without more, "does not make a *prima facie* case." 920 S.W.2d at 648. However, in *Allen v. McPhee*, a matter brought under the Tennessee Human Rights Act, the Tennessee Supreme Court held that "close temporal

company policy in dealing with the employee; (4) discriminatory treatment when compared to similarly situated employees; (5) evidence of a good work history and high or solid performance evaluations of the employee; (6) sudden and marked changes in an employee's performance evaluations after the exercise of the employee's protected rights; and (7) evidence tending to show that the [employer's] stated reason for discharge was false.

*Sykes v. Chattanooga Housing Auth.*, 343 S.W.3d 18, 29–30 (Tenn. 2011); *see also Canady*, 547 F. App'x at 679–80.

Defendant learned of Plaintiff's decision to retain counsel and terminated Plaintiff within the hour. The timeline of the events of September 7, 2012, is essentially undisputed. The phone call from Torres' attorney to Precision catalyzed an uninterrupted chain of events that quickly resulted in Hedrick, through Momberger, firing Torres. Norwood testified that she received a call at approximately 10:00 a.m. from the attorney asking for information relevant to Torres' workers' compensation case. (Norwood, Tr. II 59–60, Ex. 13.) Still at a time before lunch, she spoke with Momberger about the phone call and then approached Torres on the factory floor. (Norwood, Tr. II, 62.) Torres recorded the heated exchange with Norwood and Momberger, which lasted less

---

proximity of a complaint and a materially adverse action are sufficient to establish a prima facie case of causation." 240 S.W.3d 803, 823 (Tenn. 2007), *abrogated on other grounds by Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 785 (Tenn. 2010) (holding that the *McDonnell Douglas* burden shifting analysis is inappropriate at the summary judgment stage). The United States Court of Appeals for the Sixth Circuit declined to apply the *Allen* Court's holding in the workers' compensation context in *Ellis v. Buzzi Unicem USA*, 293 F. App'x 365, 375 (6th Cir. 2008), reasoning that *Conaster* had already decided the issue and held that temporal proximity is a "mere[] aid" in establishing a *prima facie* case for retaliatory discharge. *See also Cooper v. Wyndham Vacation Resorts, Inc.*, 570 F. Supp.2d 981, 985–86 (M.D. Tenn. 2008) ("While not alone sufficient, 'temporal proximity *plus other circumstantial evidence* of causation' can present a *prima facie* case for retaliation."). Yet later that same year, the Tennessee Court of Appeals held that "proof of close proximity in time between an employee's exercise of a protected right under the workers' compensation statutes and a materially adverse employment action is sufficient to establish a prima facie case of causation." *Kinsler v. Berkline, LLC*, No. E2007-02602-COA-R3-CV, 2008 WL 4735310, at *5 (Tenn. Ct. App. Oct. 27, 2008), *aff'd on other grounds by Kinsler v. Berkline, LLC*, 320 S.W.3d 796 (Tenn. 2010). Out of an abundance of caution, this Court will consider temporal proximity along with the other circumstantial evidence of retaliation.

than eight minutes. (Torres, Tr. I, 65–67, Ex. 2.) Momberger then called Hedrick and received authorization to fire Torres. (Hedrick, Tr. II, 111–12; Momberger, Tr. II, 13–14.) Torres testified that approximately ten to twelve minutes after the exchange, Momberger returned and verbally fired him. (Torres, Tr. I, 69.) That same day, Norwood prepared a separation notice, listing "lack of work" as the reason for separation. (Norwood, Tr. II, 94, Ex. 3.) From notification of the workers' compensation lawsuit to Torres' termination, likely no more than one hour elapsed.

In addition to the temporal proximity, Defendant's management demonstrated undeniable antagonism toward Plaintiff. Norwood and Momberger berated Torres in front of his coworkers on September 7, 2012. As is evident from the recording, Norwood and Momberger were very angry that Torres had gotten an attorney and initiated legal proceedings. (*See* Ex. 2.) Norwood repeatedly stated that Torres did not tell her that he was hurt again. (*Id.*) Momberger then said, "Why'd you go to a lawyer? You think we have to pay for that?" and ends the conversation by saying, "When Terry finds out about this shit, you're in a world of hurt." (*Id.*)

The swift change in attitude following Plaintiff's decision to hire a lawyer marked a departure in Plaintiff's otherwise stable work history with Defendant. Until September 7, 2012, Torres had solely received positive work evaluations. (Confidential Employee Folder, Ex. 10.) His only Employee Performance Evaluation from May 14, 2011, marked him in all factors— availability, adherence to policy, behavior pattern, creativity, dependability, independence, initiative, interpersonal relationships, knowledge of job, productivity, and quality—as "A," which translates to "Above Average," and even as an "A+" in the behavior pattern factor. (Ex. 9.) Although Hedrick and Momberger testified that Torres did not perform satisfactorily in many of these categories throughout the remainder of his employment (*see* Momberger, Tr. I, 142–46;

Momberger, Tr. II, 14–22, 25–37; Hedrick, Tr. II, 110–17), and despite Momberger's practice of issuing written warnings, Plaintiff's personnel file contained no written warnings or notations.

Combined with the temporal proximity, this Court finds that the antagonism demonstrated by Norwood and Momberger and the blemish-free personnel file are sufficient to establish a prima facie case of retaliation.

### B. Legitimate, Nonretaliatory Reason for Discharge

"Once the employee has made a *prima facie* case of retaliation, the burden devolves upon the employer of proving a legitimate nonpretextual nonretaliatory reason for the discharge." *Anderson*, 857 S.W.2d at 559 (citing 2A A. Larson, *The Law of Workmen's Compensation*, § 68.36(d) at 188 (1990)). Here, Hedrick testified that he "didn't know anything about an attorney" and fired Torres because he "just got tired of his crap." (Hedrick, Tr. II, 117–18.) In Precision's response to Interrogatory Number 3, the reasons for termination are listed as

> Terry Hedrick ("Hedrick") perceived Torres as a disruptive negative force and he simply had had enough. Torres had wrecked the marriage between two of Defendant's employees, Jesus Ruiz and Adriana Chavira . . . Torres was not a productive worker and for that reason was not given a raise . . . On September 7, 2012, Hedrick was out of town, and contacted by telephone by Craig Momberger and told that Torres had upset Cheri Norwood by demanding we pay his medical bills for which the Company was not responsible, and then threatening to sue with an attorney. This was perceived by Hedrick as an attempt by Torres at extortion . . . Before September 7, 2012, Hedrick was already considering terminating Torres because of his worsening performance and attitude. Torres had also been caught stealing from Precision in the past. When Hedrick heard on September 7th that Torres was causing further disruption Hedrick made the decision to terminate him. It was like the last straw.

(Hedrick, Tr. II, 114–15, Ex. 19.) The Court finds that each of these reasons are legitimate, nondiscriminatory reasons for the discharge.

### C. Mere Pretext

"Finally, if the employer offers a legitimate non-pretextual reason for the discharge, the burden shifts back to the plaintiff to produce additional, compelling evidence of pretext." *Ellis v.*

*Buzzi Unicem USA*, 293 F. App'x 365, 368 (6th Cir. 2008) (citing *Anderson*, 857 S.W.2d at 559).

An employee may demonstrate pretext by showing "(1) that the proffered reasons had no basis in

fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or

(3) that they were insufficient to motivate [the adverse employment action]." *Banks v. Argos Risk*

*Mgmt. Servs., LLC*, 963 F. Supp. 2d 778, 788 (M.D. Tenn. 2013), *amended in part,* No. 3:12-

00596, 2013 WL 5592202 (M.D. Tenn. Oct. 10, 2013), and *aff'd,* 569 F. App'x 356 (6th Cir. 2014)

(quoting *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 460 (6th Cir. 2004)); *see also Sasser v.*

*Averitt Exp., Inc.*, 839 S.W.2d 422, 427 (Tenn. Ct. App. 1992) ("An employee may contradict an

employer's assertion that the reasons for the discharge were non-pretextual either by persuading

the finder of fact that the discharge was substantially motivated by the desire to retaliate or by

showing that the employer's proffered explanation is unworthy of credence.")

> "An employer's changing rationale for making an adverse employment decision can be
> evidence of pretext," *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir.
> 1996), because "[s]hifting justifications over time calls the credibility of those justifications
> into question." *Cicero v. Borg-Warner Auto., Inc.,* 280 F.3d 579, 592 (6th Cir. 2002).
> However, "'[t]he extent to which such shifting justifications are probative of pretext
> depends upon the circumstances of a given case' and the magnitude of the
> inconsistency." *Aldridge v. City of Memphis,* 404 F. App'x 29, 38–39 (6th Cir. 2010)
> (quoting *Eades v. Brookdale Senior Living, Inc.,* 401 F. App'x 8, 13 (6th Cir. 2010)).
> Further, "[b]oth [the Sixth] Circuit and others have recognized that providing *additional*
> non-discriminatory reasons that do not conflict with the one stated at time of discharge
> does not constitute shifting justifications." *MacDonald-Bass v. J.E. Johnson Contracting,*
> *Inc.*, 493 F. App'x 718, 727 (6th Cir. 2012) (emphasis in original, collecting cases).

*Banks*, 963 F. Supp. 2d at 789.

On September 7, 2012, when Torres' Separation Notice was prepared, the reason cited for

separation was "Lack of Work." (Norwood, Tr. II, 94, Ex. 3.) However, throughout the

development of this matter, the reasons given for Torres' termination have included: general

disruption and negativity, breaking up the marriage of two coworkers, arguing and fighting with

coworkers, starting rumors, stealing stators, being arrested for theft in Missouri, lack of

productivity, and perceived extortion.  (Hedrick, Tr. II, 114–29, Ex. 19.)  This laundry list is not substantiated by negative marks in Torres' personnel file, nor did any alleged reason result in adverse employment action.  Hedrick even stated in his September 10 letter to the workers' compensation insurance company, "I think he [sic] if he could get a workers comp claim going then I would not be able to terminate his employment." (Ex. 21.)  Further, it has never been alleged since that Torres was terminated due to lack of work.

Additionally, Hedrick's comments regarding "perceived extortion" necessarily refer to the events of September 7, 2012.  (Hedrick, Tr. II, 119)  Although Hedrick credibly testified to having had no knowledge of an attorney's being involved and an actual workers' compensation claim, the "cat's paw" theory of liability imputes Momberger's clear retaliatory animus to Hedrick.  Under *Staub v. Proctor Hosp.*, "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]." 562 U.S. 411, 421–22 (2011) (applying the traditional tort law concepts to impute a supervisor's antimilitary animus to the employer under the Uniformed Services Employment and Reemployment Rights Act).  The Sixth Circuit has applied this concept to other types of claims for adverse employment action.  *See Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 377–79 (6th Cir. 2017) (holding that the cat's paw theory of liability applies to FMLA retaliation claims); *DeNoma v. Hamilton Cnty. Ct. of Common Pleas*, 626 F. App'x 101, 110 (6th Cir. 2015) (applying cat's paw theory to § 1983 gender discrimination claim); *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351–53 (6th Cir. 2012) (applying "cat's paw" theory to racial discrimination claims under Title VII and the Tennessee Human Rights Act).  The "cat's paw" theory is equally applicable to a claim for retaliatory discharge based on Tennessee workers' compensation laws.  *McLean v. CVS Pharmacy*

*Inc.*, No. 1:14-cv-3, 2016 WL 554828, at *6–7 (E.D. Tenn. Feb. 10, 2016); *Banks v. Argos Risk Mgmt. Servs., LLC*, 963 F. Supp. 2d 778, 786 (M.D. Tenn. 2013). Though the Tennessee Supreme Court has not opined on the matter, this Court sees no reason to believe that it would hold otherwise. *See McLean*, 2016 WL 554828, at *6 ("Tennessee requires that retaliatory animus be 'a substantial factor in the employer's motivation to terminate the employee's employment.' And as the United States Supreme Court pointed out in *Staub v. Proctor Hospital*, cat's paw liability is simply one avenue by which a plaintiff may establish a causal connection between her discharge and animus by her employer. If Plaintiff can establish that retaliatory animus motivated [Plaintiff's direct supervisor] to perform an act intended to influence [the supervisor's boss] to terminate Plaintiff's employment, and if that act was indeed a substantial factor in [the supervisor's boss's] decision to discharge Plaintiff, the Court sees no reason why the Tennessee Supreme Court would decline to follow the United States Supreme Court's reasoning in *Staub*.") (internal citations omitted). "Under the theory, Plaintiff must show that 'by relying on this discriminatory information flow, the ultimate decision maker acted as the conduit of the supervisor's prejudice— his cat's paw.'" *Banks*, 963 F. Supp. 2d at 787 (quoting *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008)).

This Court finds that Momberger's statements to Torres immediately following the phone call from his attorney are direct evidence of Momberger's retaliatory animus towards Torres. During the conversation in which Momberger states, "When Terry finds out about this shit, you're in a world of hurt," he also states,

> Now that you got a fucking lawyer involved. Good luck on that son of a bitch . . . I don't even get why the fucking lawyer's involved. Why? You trying to do something? . . . You think that we have to pay for that . . . I'm going to show you a lot of goddamn loyalty if that's the way you fucking do things.

(Ex. 2.) His tone is very angry, and the subject matter refers to Torres's hiring an attorney to pursue his workers' compensation claim. Momberger testified that he subsequently called Hedrick and told him "Ricardo's actions had strong implications against the company . . . And so I told him that it would be my recommendation to terminate him." (Momberger, Tr. II, 13.) Hedrick testified that he "immediately took it that him asking for the money was an extortion attempt." (Hedrick, Tr. II, 111–19.) Without conducting any independent investigation into the matter, Hedrick then authorized him to fire Torres. (Momberger, Tr. II, 14; Hedrick, Tr. II, 111.) Momberger testified that he did not relay to Hedrick that an attorney had contacted Precision regarding information for Torres' workers' compensation, and thus Hedrick likely did not have any retaliatory animus regarding the workers' compensation claim. However, the chain of events clearly demonstrates that Momberger sought authorization to fire Torres in retaliation for his workers' compensation claim. Therefore, as Torres' supervisor, Momberger's retaliatory animus may be imputed to Precision Industries.

In sum, Plaintiff has persuaded the Court that the reasons for termination produced by Defendant are clearly pretextual. Consequently, this Court finds that Defendant terminated Plaintiff in retaliation for exercising his right to file a workers' compensation claim.

## DAMAGES

Having determined that Defendant terminated Plaintiff in violation of Tennessee law, this Court will now decide which remedies are available under Tennessee law. Plaintiff seeks damages for economic losses stemming from his retaliatory discharge, namely back pay, as well as compensatory damages for emotional distress and punitive damages. As discussed below, each of these remedies is available under Tennessee law.

## A. *Backpay*

Plaintiff seeks $45,708.42 in backpay. Tennessee courts have consistently held that "back pay naturally result[s] from an employer's wrongful termination of an employee for filing a workers' compensation claim and [is] designed to make the employee whole." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 383 (Tenn. Ct. App. 2006) (citing *Sasser*, 839 S.W.2d at 432–35). Back pay is calculated by determining "the amount [the terminated employee] would have earned during the period between discharge and the trial." *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 331 (Tenn. 1996) (citing *Sasser*, 839 S.W.2d at 433). Plaintiff testified that he was earning $12 per hour and worked 40 hours per week. By his calculations, he testified that he would have earned approximately $89,440 between when he obtained work authorization and his employment at Delane Construction in July 2016. Defendant presented no proof to the contrary.

Plaintiff had a duty to minimize his loss of wages, recoverable as backpay, by searching for comparable employment. "When an employee has been wrongfully terminated, the measure of damages is the amount the employee would have earned had the employer not dismissed him, less what would have been earned, or might have been earned, in some other employment, by the exercise of reasonable diligence." *Frye v. Memphis State Univ.*, 806 S.W.2d 170, 173 (Tenn. 1991). The employee "is only required to exercise reasonable diligence in seeking other employment of a similar or comparable nature." *Id.*; *see also Ford v. Nicks,* 866 F.2d 865, 873 (6th Cir. 1989) ("An employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so.") The parties stipulated that Plaintiff earned $43,731.58 during the period for which Plaintiff seeks backpay. Thus, Plaintiff mitigated his backpay award from approximately $89,440, less $43,731.58, to $45,708.42.

Defendant argues that under *Hoffman* an undocumented worker is unable to mitigate damages without continuing to repeatedly violate IRCA. *Hoffman*, 535 U.S. at 150–51. Plaintiff significantly notes, however, that he obtained work authorization in February of 2013 and is only seeking backpay from that point until July 2016, when he obtained comparable employment with Delane Construction.

Defendant nonetheless contends that Plaintiff failed to exercise reasonable diligence in seeking other manufacturing positions. "The burden is on the employer to establish that the employee failed to exercise reasonable diligence in mitigating damages." *Frye*, 806 S.W.2d at 173 (citing *Chapdelaine v. Torrence*, 532 S.W.2d 542, 550 (Tenn. 1975)). "[T]he employer must prove both the availability of suitable and comparable substitute employment and a lack of reasonable diligence on the part of the employee." *Id.* (citing *Rasimas v. Mich. Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983)).

The only proof Defendant offered concerning the duty to mitigate came from Plaintiff himself and concerns his employment history spanning from his termination and his employment with Delane. Defendant offers no proof regarding the availability of suitable and comparable substitute employment. Thus, Defendant has not met its burden in proving that Plaintiff failed to mitigate his damages between termination from Precision and gaining employment with Delane.

Therefore, the Court finds that Plaintiff is entitled to backpay in the amount of $45,708.42.

## 1. Preemption

Defendant argues that Plaintiff's lack of work authorization when he was terminated precludes him from being allowed "to recover lost unearned wages he was not authorized to earn in the first place." (ECF No. 67 at p. 19.) Defendant contends that because the Immigration Reform Control Act ("IRCA"), 8 U.S.C. § 1324a, et seq., is a "comprehensive scheme prohibiting

the employment of illegal aliens in the United States," as stated in *Hoffman Plastics Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002), "to the extent the Tennessee workers' compensation retaliation law would award employment benefits (including reinstatement of the worker and money damages for the loss of illegal employment) it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in enacting the IRCA." (ECF No. 83-2 at p. A20.) In other words, Defendant argues that, based on the principles of field and conflict preemption, IRCA precludes Plaintiff's recovery of backpay under Tennessee common law. This Court found these arguments persuasive in its original order but now holds that an award of backpay under Tennessee retaliatory discharge law is not preempted by IRCA.

The Immigration Reform and Control Act makes the knowing employment of unauthorized aliens unlawful. 8 U.S.C. § 1324a(a). It also requires that employers comply with an extensive employment verification system to ensure that their new hires are either citizens or authorized to work in the United States. *Id.* § 1324a(b). Employers who violate IRCA are subject to civil and criminal sanctions. *Id.* § 1324a(e)(4)–(5), (f). Conversely, under IRCA, it is unlawful for any applicant to use or attempt to use fraudulent documentation required by the Act in order to obtain employment. *Id.* § 1324c.

The Supremacy Clause states that "[the] Constitution, and the laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. From this clause flows the doctrine whereby federal law may preempt state law by (1) express provision, (2) occupying the entire regulatory field, or (3) conflicting with state law by either making compliance with both state and federal law physically impossible or standing as an obstacle to Congress's purposes and objectives. *See, e.g.*, *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015); *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990); *Affordable Hous. Found.*,

*Inc. v. Silva*, 469 F.3d 219, 238 (2d Cir. 2006). Congress must convey a "clear and manifest" intent to preempt "the historic police powers of the States," such as state labor laws. *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Defendant's arguments focus on field and conflict preemption.

  *a. Field Preemption:*

"States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* at 399 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 115 (1992)).

> . . . Congress'[s] intent to supersede state law altogether may [also] be found from a scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04 (1983) (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982)) (internal quotation marks omitted).

This Court previously reasoned that "[i]mmigration policy, even as it intersects with labor protections, is . . . an area squarely within the federal government's prerogative." *Torres v. Precision Indus., Inc.*, 2018 WL 3474088, at *6 (W.D. Tenn. July 19, 2018). This led to the conclusion that "an award of backpay for a lost job that Plaintiff was not permitted to have in the first place runs counter to IRCA and *Hoffman*." (*Id.* at 13.)

In his brief to the Sixth Circuit, Plaintiff argued that this Court erred in its conclusion. Plaintiff contends that Congress never intended IRCA to leave undocumented employees vulnerable to "unscrupulous" employers, rather "the rights and remedies provided by the States

were to continue unabated, in tandem with and, in fact, were a critical part of the effort to achieve IRCA's goals." (ECF No. 83-1, at p. 25–26.) Plaintiff cites two House Reports from the Judiciary Committee and Committee on Education and Labor that provide insight into Congress's intended effect on state labor protections. The Judiciary Committee's report states, "It is not the intention of the [House Judiciary] Committee that the employer sanctions provisions of the bill be used to undermine or diminish in any way labor protections in existing law." H.R. Rep. No. 99-682(I), at 58, *reprinted in* 1986 U.S. Code Cong. & Admin. News 5649, 5662. Similarly, the Committee on Education and Labor's Report states,

> In addition, the committee does not intend that any provision of this Act would limit the powers of State or Federal labor standards agencies . . . to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by these agencies. To do otherwise would be counter-productive of our intent to limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment.

H.R. Rep. No. 99-682(II), at 8–9, *reprinted in*, 1986 U.S. Code Cong. & Admin. News 5757, 5758. Accordingly, Congress did not intend that IRCA should preclude an undocumented worker from recovering backpay when terminated in retaliation for filing a workers' compensation claim under state law.

In response, Defendant relies on *Arizona* and *Hoffman* to support the proposition that "any state law that would conflict with forcefully combatting the employment of unauthorized aliens would be preempted by IRCA." (ECF No. 83-2, at p. A20.) However, *Arizona* does not deal with the employment of unauthorized aliens, and *Hoffman* does not deal with a conflict between state and federal law. *See Arizona*, 567 U.S. at 393–94; *Hoffman*, 535 U.S. at 142–43.

Consequently, upon further review and deliberation, this Court is unable to discern a clear and manifest intention of Congress to preempt state laws regulating labor, specifically workers' compensation. Rather, even if this Court "heed[s] *Hoffman Plastic's* admonition to afford the

House Report[s] little weight in identifying Congress's affirmative endorsement of other statutory remedies," these Reports provide enough to counter any assertion that Congress clearly and manifestly intended IRCA to preclude backpay in this case. *Affordable Hous. Found., Inc.*, 469 F.3d at 241. Therefore, this Court now finds no field preemption in this case.

### b. *Conflict Preemption:*

Conflict preemption may occur in two distinct ways. One type of conflict preemption occurs when it is "impossible for a private party to comply with both state and federal requirements." *English*, 496 U.S. at 79. The other entails a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (internal quotation marks omitted). This presents a closer question.

### i. Physical impossibility:

Compliance with both Tennessee's workers' compensation statutory scheme and common law and IRCA is not physically impossible. The Minnesota Supreme Court issued an opinion on a very similar set of circumstances to the case at hand in *Sanchez v. Dahlke Trailer Sales, Inc.*, 897 N.W.2d 267 (Minn. 2017). Sanchez, an undocumented worker, presented a false Social Security number to gain employment with Dahlke. *Sanchez*, 897 N.W.2d at 270. Sanchez injured himself on the job, and Dahlke sent him to the hospital and reported the injury to its workers' compensation insurance carrier. *Id.* at 271. Sanchez hired an attorney for advice about the process and filed a workers' compensation claim. *Id.* During a deposition about that claim, Dahlke allegedly found out that he was illegal and terminated him within about one week. *Id.*

Critically, the Supreme Court of Minnesota analyzed the interplay between Minnesota's workers' compensation antiretaliation statute and IRCA. Dahlke argued that it could not have

complied with both IRCA and the Minnesota workers' compensation antiretaliation statute.[2]  The

court addressed Dahlke's conflict preemption analysis as follows:

> Because of [the] retaliatory-motive requirement, it is possible for an employer in Dahlke's position to comply with the workers' compensation antiretaliation statute without running afoul of the IRCA.  Dahlke would have followed the IRCA without violating the antiretaliation statute if it discharged Sanchez because of his immigration status, and not because of his protected activity.  Thus, it is possible for a private party to comply with both statutes.

*Id.* at 277.  Further, the court eloquently characterized the complementary policies underlying state

labor laws and IRCA:

> Enforcing labor laws against employers that employ undocumented workers does not stand as an obstacle to the purpose of the federal immigration law.  Rather, such enforcement *furthers* the IRCA's goal of discouraging employers from hiring unauthorized aliens.  If the workers' compensation antiretaliation statute does not apply to employers of undocumented workers, then those employers are in a position to save costs, especially in borderline cases in which they can plausibly claim ignorance of an employee's immigration status until after he or she becomes injured at work.

*Id.*  Consequently, the Court held that Minnesota's workers' compensation antiretaliation statute

did not conflict with IRCA.  *Id.* at 278.

Tennessee's common law claim for retaliatory discharge for filing a workers'

compensation claim likewise requires, as discussed *supra*, that the filing of the workers'

compensation claim be a substantial factor in the employer's motivation to terminate the employee.

An employer in Tennessee is fully able to both comply with IRCA and refrain from discharging

employees in retaliation for filing a workers' compensation claim.  Thus, the Minnesota Supreme

Court's analysis is instructive on the interplay between Plaintiff's claim for retaliatory discharge

and IRCA.

---

[2] Minnesota Statutes Annotated Section 176.82 states, in relevant part, "Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages incurred by the employee . . . ."

In the case at hand, Defendant did not fire Plaintiff for his undocumented status or for failing to provide proper documentation or for providing falsified documentation. Rather, Defendant fired him within minutes of a phone call from his attorney requesting information for his workers' compensation claim. According to the testimony at trial, Plaintiff's immigration status did not factor into his termination, as all parties involved testify that they did not know his status.

ii.     <u>Stands as an obstacle</u>

The award of backpay to an undocumented worker that was fired in retaliation for filing a workers' compensation claim does not stand as an obstacle to IRCA's purpose of combatting the employment of illegal aliens. "What constitutes a sufficient obstacle 'is a matter of judgment,' to be informed by reference to the overall federal statutory scheme. . . The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption . . . ." *Affordable Hous. Found., Inc.*, 469 F.3d at 241.

Congress enacted IRCA to "'forcefully' [make] combatting the employment of illegal aliens central to '[the] policy of immigration law.'" *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002). However,

> insofar as an undocumented worker's employment necessarily originates in a past IRCA violation that would presumably have continued but for the injury, the Supreme Court has thus far recognized a backpay or lost earnings award to conflict with federal immigration law only when the IRCA violation prompting employment was committed by the employee, not . . . by the employer.

*Affordable Hous. Found., Inc.*, 469 F.3d at 247 (citing *Hoffman Plastic Compounds, Inc.*, 535 U.S. at 149-50). In other words, so long as the employee did not violate IRCA, an award of backpay does not stand as an obstacle to Congress's purposes and objectives.

Before hiring Plaintiff, Defendant did not verify that Plaintiff was not an unauthorized alien, in violation of 8 U.S.C. § 1324a(b). This Court maintains that Terry Hedrick's testimony that he was unaware of Plaintiff's immigration status until after he was terminated and was unaware that the company needed further documentation was credible. *Torres v. Precision Indus., Inc.*, 2018 WL 3474088, at *6 (W.D. Tenn. July 19, 2018). Upon further review, however, this Court reconsiders its finding that what essentially amounts to willful ignorance of immigration status and ignorance of the requirements of employers under IRCA excuses failure to comply with IRCA. *See id.*

IRCA requires the employer to have a prospective employee present documentation and complete an I-9 Employment Eligibility Verification Form. 8 C.F.R. § 274a.2(b)(1)(i). Within three business days of hiring an employee the employer must "[p]hysically examine the documentation presented by the individual establishing identity and employment authorization . . . and ensure that the documents presented appear to be genuine and to relate to the individual." *Id.* § 274a.2(b)(1)(ii). Here, Defendant's hiring process did not include any documentation verification, as required by IRCA. (Vicki Hedrick, Tr. II, 198–99.) This Court's focus on whether Defendant "knowingly violated IRCA" in its previous order, rather than whether Defendant actually complied with IRCA, was misplaced.[3] *See Bollinger Shipyards, Inc. v. Dir., Office*

---

[3] Defendant was willfully ignorant that it employed undocumented workers. Mr. Momberger testified that he hired Plaintiff without even asking about his work authorization status, while Plaintiff testified that during his interview, he told Mr. Momberger that he had a valid driver's license but did not have work authorization. (Momberger, Tr. I, 142; Torres, Tr. I, 33.) At best, this is willful ignorance as to Plaintiff's work authorization status. Defendant hired Plaintiff on January 5, 2011. (Hedrick, Tr. II, 110.) Then, in response to receipt of a letter from the state, Mr. Hedrick held a meeting with all employees in March 2012 requiring them to produce documentation and fill out an I-9 by November 15, 2012. (Hedrick, Tr. II, 144.) Mr. Hedrick testified that he noticed "a lot of nervousness" over the next few weeks as "everybody was scrambling trying to get a driver's license" which "threw up a red flag, thinking they may be all illegal." (Hedrick, Tr. II, 144–45, 165.) He stated, "all the Caucasians came in and filled out

*Workers' Comp. Programs*, 604 F.3d 864, 874 (5th Cir. 2010) ("Congress focused foremost on the employer. Under the IRCA, *employers* must verify the identity and eligibility of all new hires by examining specified documents before each employee begins work. If a prospective new hire is unable to produce the required documentation, the *employer* may not hire the individual.") Defendant indisputably did not complete I-9 forms for Plaintiff or any of its employees before 2012.[4] Consequently, Defendant violated IRCA.

Contrary to Defendant's position, any violation on Plaintiff's part is minimal, at most, and certainly does not warrant preemption of recovery. The IRCA provision on penalties for document fraud states in relevant part

> It is unlawful for any person or entity knowingly—
>
> (1) to forge, counterfeit, alter, or falsely make *any document for the purpose of satisfying a requirement of this chapter or to obtain a benefit under this chapter*,
> (2) to use, attempt to use, possess, obtain, accept, or receive or to provide any forged, counterfeit, altered, or falsely made *document in order to satisfy any requirement of this chapter or to obtain a benefit under this chapter*,
> (3) to use or attempt to use or to provide or attempt to provide *any document lawfully issued* to or with respect to a person other than the possessor (including a deceased individual) *for the purpose of satisfying a requirement of this chapter or obtaining a benefit under this chapter*,
> . . .
> (5) to prepare, file, or assist another in preparing or filing, any application for benefits under this chapter, or any document required under this chapter, or any document submitted in connection with such application or document, with

---

everything. But the Hispanics, hardly anybody, nobody would come in and sign the I-9." (Hedrick, Tr. II, 164–65.) When he realized he would lose "half [his] crew" and was "struggling trying to get people hired and trained," he decided to push the deadline to January 1, 2013. (Hedrick, Tr. II, 165.) Not until April 30, 2013, when they were able to get a crew trained and ready to go, did Defendant issue separation notices for four individuals when they were unable to fill out the I-9. (Norwood, Tr. II, 69–71; Hedrick, Tr. II, 145–47, 165.)

[4] Even the good faith defense under §1324a(a)(3) is unavailable where the employer has not completed the I-9 verification form. *Buffalo Transp., Inc. v. United States*, 844 F.3d 381, 385 (2d Cir. 2016); *Maka v. USINS*, 904 F.2d 1351, 1358 (9th Cir. 1990); *see also DLS Precision Fab LLC v. U.S. Immigration & Customs Enf't*, 867 F.3d 1079, 1084 (9th Cir. 2017) ("The statute limits this defense . . . to technical or procedural violations, as opposed to substantive violations.")

knowledge or in reckless disregard of the fact that such application or document was falsely made or, in whole or in part, does not relate to the person on whose behalf it was or is being submitted . . .

8 U.S.C. § 1324c(a).  Here, Defendant hired Plaintiff on January 5, 2011.  (T. Hedrick, Tr. II, 110.)  Admittedly, after obtaining employment, Plaintiff provided a valid North Carolina driver's license but signed a W-4 using a false Social Security number on January 17, 2011.  However, the false Social Security number was used on an IRS form regarding the withholding of federal income tax—not to prove work authorization on an I-9, to gain employment, or to fulfill any other requirement of IRCA.  Vicki Hedrick testified that this information was solely requested for payroll purposes, not as a requirement for gaining employment.  (V. Hedrick, Tr. II, 198–99.)  Plaintiff then continued to work for Defendant for approximately one and a half years.

Under IRCA, the burden is on the employer to ensure its employees are authorized to work in the United States, and Defendant did not take the steps required by the Act, which likely would have revealed Plaintiff's use of a fraudulent social security number.  Thus, this Court now holds that this matter is not conflict preempted and backpay is available as a remedy for Plaintiff's termination in retaliation for filing a workers' compensation claim.

### B.  Compensatory Damages

Plaintiff seeks $75,000 in compensatory damages.  (ECF No. 68 at p. 47.)  In Tennessee, "[a] claimant in a retaliatory discharge case may recover for the emotional distress caused by his firing."  *Anderson v. A & F Elec. Co., Inc.*, No. M2005-00610-COA-R3-CV, 2006 WL 2105885 at *4 (Tenn. Ct. App. July 28, 2006) (citing *Davis v. Reliance Elec. Indus. Co.*, 104 S.W.3d 57, 63 (Tenn. Ct. App. 2002)).

Defendant, however, in its Supplement to Pre-Trial Brief (ECF No. 60), objected to "Plaintiff presenting any computation or specific dollar amount for alleged emotional distress" due

to Plaintiff's failure to provide any computation or specific dollar amount for such damages in his Rule 26 Initial Disclosure. (*See* ECF No. 60-1.) Defendant renewed this objection at trial. (Torres, Tr. I, 67–68.)

Generally, pursuant to Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure, the party seeking damages must "make available for inspection and copying . . . the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]" "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Compensatory damages for emotional distress, however, are generally not subject to the disclosure requirement of Rule 26 (a)(1)(A)(iii) and are typically considered a fact issue for the factfinder. *Williams v. Trader Publishing Co.,* 218 F.3d 481, 486 n.3 (5th Cir. 2000) ("Since compensatory damages for emotional distress are *necessarily vague* and are generally considered a fact issue for the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)[(A)(iii)].") (emphasis added); *Evenson v. Palisades Collection, LLC*, No. 2:13-CV-1226, 2014 WL 5089429, at *4 (S.D. Ohio Oct. 9, 2014) ("[C]ourts have generally recognized that emotional distress and punitive damages are typically not amenable to the type of disclosures contemplated by Rule 26(a)(1)(A)(iii), and have held that the failure to disclose a number or calculation for such damages was substantially justified."); *Rosson v. Wyndham Vacation Resorts, Inc.*, No. 3-10-0429, 2011 WL 92053, at *1 (M.D. Tenn. Jan. 11, 2011) ("Courts have held, however, that because emotional suffering is *personal and difficult to quantify* and because compensatory damages are typically considered a fact issue for the jury,

emotional distress damages are not subject to the kind of calculation contemplated by Rule 26(a)(1)[A](iii).") (emphasis added).  Therefore, the Court overrules Defendant's objection with respect to the proof offered at trial regarding Plaintiff's emotional distress.

Consequently, this Court finds that the nature of the emotional distress Plaintiff has experienced warrants the award of nominal compensatory damages in the amount of $1,000.  In his Initial Disclosures, Plaintiff disclosed that he would be testifying at trial "about the emotional impact he suffered and continues to suffer because of his termination."  (ECF No. 60-1 at p. 1.) Plaintiff testified that he felt stressed, depressed, and frustrated after his termination due to the nature of his termination and his interactions with Ms. Norwood and Mr. Momberger.  He also testified that he received counseling from the priest of Santa Maria Church.  Plaintiff demonstrated that his termination detrimentally affected him but gave no specific proof as to why his emotional distress warrants $75,000 in damages.  The Court, therefore, concludes that an award of $1,000 is appropriate and sufficient to compensate Plaintiff for his emotional distress.

### C. Punitive Damages

Plaintiff seeks $70,000 in punitive damages.  (ECF No. 68 at p. 51.)  Punitive damages are available in cases of retaliatory discharge. *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984) ("We therefore hold that in future cases a successful plaintiff in a suit for retaliatory discharge will be permitted to recover punitive damages . . . ."); *Baines v. Wilson County*, 86 S.W.3d 575, 580 n.2 (Tenn. Ct. App. 2002); *see Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 328 (Tenn. 1996).  "After the *Clanton* decision, the Tennessee Supreme Court, in *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 900–01 (Tenn. 1992), held that in order to recover punitive damages, a plaintiff must prove, by clear and convincing evidence, that the defendant acted (1)

intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Anderson v. A & F Elec. Co.,*

*Inc.*, No. M2005-00610-COA-R3-CV, 2006 WL 2105885 at *4 (Tenn. Ct. App. July 28, 2006).

> "[A] key feature of punitive damages [is] that they are never awarded as of right, no matter how egregious the defendant's conduct." *Smith v. Wade,* 461 U.S. 30, 52 (1983). Rather, once the plaintiff proves that the defendant's conduct triggers consideration of punitive damages, the factfinder makes the "discretionary moral judgment" whether or not to award punitive damages. *Id.* In exercising his discretion, the factfinder should consider that "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct *and* to deter others from similar behavior." *Memphis Comm. School Dist. v. Stachura,* 477 U.S. 299, 306 n. 9, 106 (1986) (emphasis added).

*King v. Zamiara*, 788 F.3d 207, 217 (6th Cir. 2015).

Should the Court determine that an award of punitive damages is appropriate, the Court

must then determine the amount. Under Tennessee Code Annotated Section 29-39-104,

> the trier of fact, in determining the amount of punitive damages, shall consider, to the extent relevant, the following: the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing; the impact of the defendant's conduct on the plaintiff; the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; the expense plaintiff has borne in attempts to recover the losses; whether the defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior; whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act; whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages.

In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–84 (1996), the Supreme Court of the

United States

> adopted three guideposts for determining whether a defendant has adequate notice of the magnitude of the sanction that may be imposed. The first and most important guidepost is the reprehensibility of the defendant's conduct. . . . The second guidepost is the ratio between the punitive damage award and the actual harm suffered by the plaintiff. . . . The final guidepost requires courts to compare the punitive damage award to civil or criminal penalties that could be imposed for similar conduct.

*Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 537 (Tenn. 2008).

Defendant, in its Supplement to Pre-Trial Brief (ECF No. 60), objected to "Plaintiff presenting any computation or specific dollar amount for alleged . . . punitive damages" due to Plaintiff's failure to provide any computation or specific dollar amount for such damages in his Rule 26 Initial Disclosure. (*See* ECF No. 60-1.) Defendant renewed this objection at trial. (Torres, Tr. I, 81–82.) However, as with compensatory damages, "punitive damages are typically not amenable to the type of disclosures contemplated by Rule 26 (a)(1)(A)(iii)." *Evenson*, 2014 WL 5089429, at *4 (citing *Scheel v. Harris*, No. 3:11-17-DCR, 2012 WL 3879279 at *7 (E.D. Ky. Sept. 6, 2012); *EEOC v. Wal-Mart Stores, Inc.*, 276 F.R.D. 637, 639 (E.D. Wash. 2011)). Therefore, this Court overrules the objection regarding punitive damages.

Here, the conduct of Mr. Momberger and Ms. Norwood on September 7, 2012, was certainly intentional and malicious, warranting an award of punitive damages. Momberger and Norwood berated Plaintiff—their speech replete with expletives—on the factory floor in front of his coworkers within minutes of finding out that he had retained an attorney to pursue a workers' compensation claim. This indicates to the Court that their subsequent actions in procuring his termination were intentional and malicious. This Court finds that an award of punitive damages is necessary to punish Defendant for its conduct and to deter other employers from treating its employees in such a manner.

This Court finds that an award of $50,000 will effectively punish the Defendant and deter others from similar behavior, based on a consideration of the relevant factors and guideposts. As discussed above, Defendant fired Plaintiff almost immediately after receiving a phone call from his attorney requesting information regarding a workers' compensation claim. Terminating an employee in retaliation for pursuing a statutory right is clearly reprehensible. Defendant was in a position of power over Plaintiff, as the employer controls the economic fate of the employee, and

Defendant's actions—through its employees—left an injured employee without a way to generate income.  However, Defendant's reprehensible conduct did not persist over a long period of time.  Moreover, Defendant did not profit from terminating Plaintiff, as it lost an employee and assumed the costs attendant to Plaintiff's workers' compensation claim.

An approximately one to one ratio between the actual harm suffered by Plaintiff and a punitive damages award appropriately punishes Defendant for the egregiousness of its employees' actions and effectively deters employers from acting in a similar manner.  This Court, therefore, concludes that an award of $50,000 is appropriate.

## CONCLUSION

In sum, this Court finds that Defendant violated Tennessee law by firing Plaintiff in retaliation for filing a worker's compensation claim.  For the reasons discussed above, Plaintiff is entitled to $45,708.42 in backpay, and this award is not preempted by federal law.  Plaintiff is also entitled to $1,000 in compensatory damages and $50,000 in punitive damages.  This equals a total award of $96,708.42.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date:  January 27, 2020.