**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: April 22, 2021

Mr. Bryce W. Ashby
1545 Union Avenue
Memphis, TN 38104

Marisa Diaz
Mr. Christopher Ho
Legal Aid At Work
180 Montgomery Street, Suite 600
San Francisco, CA 94104

Mr. James Leon Holt Jr.
Ms. Paula Rachelle Jackson
Jackson, Shields, Yesier & Holt
262 German Oak Drive
Cordova, TN 38018

Mr. Steven George Wilson
5100 Poplar Avenue, Suite 2700
Memphis, TN 38137

    Re: Case No. 20-5492, *Ricardo Torres v. Precision Industries, Inc.*
         Originating Case No. : 1:16-cv-01319

Dear Counsel,

  The court today announced its decision in the above-styled case.

  Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                          Yours very truly,

                          Deborah S. Hunt, Clerk

                          Cathryn Lovely
                          Deputy Clerk

cc: Mr. Thomas M. Gould

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0090p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

RICARDO TORRES,

    *Plaintiff-Appellee*,

  *v.*

PRECISION INDUSTRIES, INC.,

    *Defendant-Appellant*.

No. 20-5492

---

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:16-cv-01319—S. Thomas Anderson, District Judge.

Decided and Filed: April 22, 2021

Before: GRIFFIN, KETHLEDGE, and THAPAR, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:** James L. Holt, Jr., Paula J. Jackson, JACKSON, SHIELDS, YESIER, HOLT, OWEN & BRYANT, Memphis, Tennessee, for Appellant. Steve Wilson, THE STEVE WILSON FIRM, Memphis, Tennessee, Bryce Ashby, DONATI LAW, PLLC, Memphis, Tennessee, for Appellee. Marisa Díaz, Christopher Ho, LEGAL AID AT WORK, San Francisco, California, for Amici Curiae.

---

**OPINION**

---

PER CURIAM. Federal law makes it illegal to employ undocumented aliens, but Tennessee's workers' compensation law still protects them. So if a Tennessee company fires an undocumented employee for filing a workers' compensation claim, the employee can sue for damages. Because of the federal law, the company cannot be required to pay lost wages that the

alien was not allowed to earn. But it's still on the hook for wages the employee could have lawfully received, as well as for other damages unrelated to the employee's immigration status.

Ricardo Torres obtained authorization to work in the United States several months after he was fired for filing a workers' compensation claim. The district court appropriately awarded him backpay for the period in which he was authorized to work, plus non-economic and punitive damages. But the court mistakenly included two extra months' wages in the backpay calculation. We reduce the damage award accordingly and affirm.

I.

Ricardo Torres worked for Precision Industries from January 2011 until he was fired in September 2012. He was not legally authorized to work in the United States during this period, but he obtained work authorization about five months later. Precision did not learn of Torres's unauthorized status until this litigation. (Torres had listed a fake Social Security number on a tax form when he started the job.)

In May 2012, Torres injured his back at work. He reported the injury to Precision's safety manager, Cheri Norwood, who scheduled a doctor's appointment for later that day. A week later, Torres returned to work—but the pain got worse. Norwood did not schedule a new doctor's appointment, so Torres scheduled his own and presented Precision with the doctor's bill.

Precision wouldn't pay, so Torres hired a lawyer to pursue a workers' compensation claim. When the lawyer contacted Precision, Norwood said that Torres's claim was closed and ended the call. Immediately after, Norwood and Torres's supervisor, Craig Momberger, confronted Torres. Torres recorded the conversation. On the recording, Norwood threatened to "knock the hell out of" Torres. And in a profanity-laced diatribe, Momberger added:

> I don't even get why the f---ing lawyer's involved. Why? You trying to do something? . . . You think that we have to pay for that[?] . . . I'm going to show you a lot of g-ddamn loyalty if that's the way you f---ing do things[.] . . . When Terry [Hedrick] finds out about this s---, you're in a world of hurt.

After the conversation, Momberger called Terry Hedrick, the company's president and owner. Momberger said that Torres's actions "had strong implications against the company" and recommended that Hedrick fire Torres. Hedrick agreed, and Momberger fired Torres right afterwards. Hedrick didn't know that Torres had hired an attorney to pursue a workers' compensation claim.

Torres sued. He claims Precision violated Tennessee law by firing him in retaliation for making a workers' compensation claim.

The district court conducted a bench trial. After Torres presented his evidence, Precision moved for judgment on partial findings, contending that Torres was not entitled to recover backpay or non-economic damages. The district court granted the motion. It held that the Immigration Reform and Control Act of 1986 precluded Torres's state law retaliation claim.

We reversed. We held the district court erred by deciding the preemption question without first deciding whether Precision was liable and if so, what damages were available under Tennessee law. On remand, the district court found Precision liable for retaliatory discharge and held that federal law did not preempt a damage award. The court awarded Torres backpay, compensatory damages for emotional distress, and punitive damages. Precision appealed.

II.

We first review the district court's liability determination. Precision argues that the evidence does not support the conclusion that it wrongfully terminated Torres under Tennessee law. We disagree.

Tennessee's common law expressly prohibits employers from firing employees for filing workers' compensation claims. *See Williams v. City of Burns*, 465 S.W.3d 96, 108–09 (Tenn. 2015); *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 444–45 (Tenn. 1984). To make a claim for retaliatory discharge, a former employee must show that his application for workers' compensation benefits was a "substantial motivating factor" in the employer's decision to end the employment relationship. *Sasser v. Averitt Exp., Inc.*, 839 S.W.2d 422, 426 (Tenn. Ct. App.

1992). The district court did not err in concluding that Torres's workers' compensation claim was a substantial motivating factor in Precision's decision to fire him.

Start with the court's factual conclusion that Momberger acted with retaliatory animus toward Torres. For one thing, the animus is apparent from the audio recording of their conversation. On the recording, Momberger asked Torres: "Why'd you go to a lawyer? You think we have to pay for that?" And he followed up with a threat: "When Terry [Hedrick] finds out about this sh--, you're in a world of hurt." Then he called Hedrick and recommended that Torres be fired. From this evidence, the district court reasonably concluded that Momberger was "very angry that Torres had gotten an attorney and initiated legal proceedings." R. 84, Pg. ID 1381.

And Torres had a stable work history with Precision until this incident. Indeed, Momberger had given him universally high marks on his only performance evaluation. But not one hour after learning that Torres hired a lawyer, Momberger had him fired. The district court found this "swift change in attitude" marked by Momberger's tirade to be further evidence that Torres's workers' compensation claim was a substantial factor in his termination.

To be sure, Hedrick and Momberger testified that they fired Torres for non-retaliatory reasons. But the district court doubted the credibility of these explanations, in part because their stated reasons for firing Torres had changed substantially over time. *See Sasser*, 839 S.W.2d at 427. Credibility determinations—especially when made with the benefit of in-person testimony—receive strong deference on appellate review. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). We see no reason to disturb them here, and nothing else in the record suggests that the district court clearly erred in weighing the evidence.

Nor did the district court commit legal error by imputing Momberger's retaliatory animus to Precision—even though the company's ultimate decisionmaker, Terry Hedrick, was unaware of Torres's protected activity. After his conversation with Torres, Momberger immediately called Hedrick and recommended that Torres be fired. And Hedrick accepted Momberger's recommendation without further investigation.

Still, Precision argues that it cannot be liable for Momberger's actions because Tennessee law does not define an employer to include the employer's agents. This argument lacks merit. Tennessee courts routinely hold corporations liable for wrongful discharge based on their agents' retaliatory animus. *See, e.g.*, *Sasser*, 839 S.W.2d at 428; *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 389–95 (Tenn. Ct. App. 2006). Thus, the district court did not err by relying on agency principles to establish causation.

### III.

Having concluded that the district court did not err in its liability determination, we now consider whether federal law preempts the damages award. Although the Immigration Reform and Control Act of 1986 preempts backpay awards for lost wages that an alien was not entitled to receive, it does not preempt backpay for wages that the alien would have lawfully earned. Nor does it preempt compensatory and punitive damage awards unrelated to an employee's immigration status. Thus, we affirm most of the district court's damages award. But because that award includes two months of backpay for a time in which Torres was unauthorized to work in the United States, we reduce the award accordingly.

### A.

As in any preemption case, we deal here with an apparent conflict between two separate employment-law-related regulatory regimes, one state and one federal. Our analysis begins with a summary of each.

Tennessee provides a cause of action for retaliatory discharge when an employer fires an employee for filing a workers' compensation claim. *See supra*, Part II; *Clanton*, 677 S.W.2d at 444–45. Successful plaintiffs may obtain a variety of remedies, including reinstatement, backpay, damages for emotional distress, and punitive damages. *See, e.g.*, *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 899–902 (Tenn. 1992). Because Tennessee's workers' compensation statute defines an "employee" as "every person . . . whether lawfully or unlawfully employed," Tennessee courts—including in litigation involving these parties—have reasoned that the statute allows claims by individuals unauthorized to work in the United States. *See* Tenn. Code. Ann.

§ 50-6-102(12)(A); *Torres v. Precision Indus.*, 2014 WL 3827820, at *5–10 (Tenn. Ct. App. Aug. 5, 2014).

Tennessee's worker's compensation law is in some tension with the federal Immigration Reform and Control Act of 1986. IRCA, as it is commonly known, prohibits employers from knowingly hiring or continuing to employ unauthorized aliens. 8 U.S.C. § 1324(a). So if an employer discovers that one of its employees is not authorized to work in the country, IRCA "compel[s]" it to discharge the employee "upon discovery of the worker's undocumented status." *Hoffman*, 535 U.S. at 148 (citing § 1324a(a)(2)). Employers who do not comply are subject to civil and criminal penalties. *See* 8 U.S.C § 1324a(e)(4)–(5), (f)(1). IRCA also provides for criminal prosecutions of those who use fraud, perjury, and related misconduct to obtain employment, though it does not generally make it a crime for aliens to seek or engage in unauthorized work. *Id.* §§ 1324a(b)(5), (d)(2)(F)–(G), 1324c(a); 18 U.S.C. § 1546(b); *Arizona v. United States*, 567 U.S. 387, 404 (2012).

B.

"[S]tate laws that interfere with, or are contrary to [federal law] are invalid." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (internal quotation marks omitted). Federal law may preempt state law expressly or implicitly. *McDaniel v. Upsher-Smith Labs, Inc.*, 893 F.3d 941, 944 (6th Cir. 2018). Because the district court did not address express preemption and the parties do not press the issue on appeal, we address only implied preemption.

Implied preemption has two types, field and conflict. *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 583–84 (6th Cir. 2013). The former applies when federal law is so "pervasive" in one particular field that it exclusively occupies that field. *In re Schafer*, 689 F.3d 601, 614 (6th Cir. 2012). The latter applies when federal and state laws conflict in a way that would make compliance with both impossible, or when the state laws "interfere[] with the operation of the federal program." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 604 (2011). Whether a federal law preempts state law is a legal question we review de novo. *McDaniel*, 893 F.3d at 944.

C.

*Field Preemption*. "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. That determination "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (internal quotation marks and ellipses omitted). Because preemption can trammel upon state sovereignty, courts apply a "strong presumption" against implied preemption in fields that States traditionally regulate. *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015). In our view, two factors counsel against a finding of field preemption here.

First, Congress expressly considered preemption when it enacted IRCA. It preempted state laws imposing sanctions on employers for employing unauthorized aliens. *See* 8 U.S.C. § 1324a(h)(2). Because this preemption provision defines the statute's preemptive reach, this "implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

Second, defining the scope of the relevant "field" matters. True, "Congress enacted IRCA as a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman*, 535 U.S. at 147). And it is beyond debate that the Federal government "has significant power to regulate immigration." *Id.* at 416. But a statute's "comprehensiveness, without a concomitant congressional indication of intention to preempt, is insufficient to preclude state law." *Downhour v. Somani*, 85 F.3d 261, 268 (6th Cir. 1996). IRCA says nothing and regulates nothing with respect to what causes of action individuals may bring or what remedies individuals may seek against employers.

"States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." *DeCanas v. Bica*, 424 U.S. 351, 356 (1976), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404; *see also Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987) ("[E]stablishment of labor standards falls

within the traditional police power of the State."); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (similar). IRCA creates a scheme designed to halt the hiring and continued employment of unauthorized aliens. But this does not mean Congress has occupied the *entire* field of employment regulation, including causes of action arising out of an individual's employment, authorized or not.

D.

*Conflict Preemption.* There are two types of conflict preemption: impossibility and obstacle. *McDaniel*, 893 F.3d at 944. The first occurs when it is impossible to comply with both federal and state regulations. *Fednav, Ltd. v. Chester*, 547 F.3d 607, 623 (6th Cir. 2008). The second occurs when the state law is "an obstacle to the accomplishment and execution of" the federal scheme. *Id.* (citation omitted); *Whiting*, 563 U.S. at 604. In other words, if the state law would cause the federal law's "operation [to] be frustrated and its provisions [to] be refused their natural effect," the state law "must yield to the regulation of Congress." *Chrysler Grp. LLC v. Fox Hills Motor Sales, Inc.*, 776 F.3d 411, 424 (6th Cir. 2015) (internal quotation marks and alterations omitted).

1.

The Supreme Court's *Hoffman* decision is the focal point of our conflict analysis. That case shares several similarities with this one. An unauthorized employee tendered a fraudulent document to obtain employment with the employer. 535 U.S. at 141. The employer later fired him for engaging in protected activity (there, actions protected by the National Labor Relations Act), and the National Labor Relations Board entered an order requiring the employer to remedy this violation by paying the unauthorized employee backpay. *Id.* at 141–42. The Court vacated the order, concluding "that awarding backpay to illegal aliens runs counter to policies underlying IRCA." *Id.* at 149.

Its reasoning was simple. Under IRCA, it is "impossible" for an unauthorized alien to obtain employment "without some party directly contravening explicit congressional policies." *Id.* at 148. That is, "[e]ither the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires

the undocumented alien in direct contradiction of its IRCA obligations." *Id.* An award of backpay, in either case, "trivializes" IRCA. *Id.* at 150. Not only that, it "condones and encourages future violations"—unauthorized aliens would have an incentive to remain in the United States, avoid apprehension by immigration officials, and violate IRCA again by seeking future employment with a different employer in order to comply with mitigation-of-damages requirements. *Id.* at 150–51. In sum, an "award of backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy." *Id.* at 151.

So too here. IRCA prohibits both the hiring *and* continued employment of an unauthorized alien. As in *Hoffman*, the desired backpay remedy stems from an illegal employment arrangement. An award of backpay for unauthorized work, then, subverts the statute by forcing an employer to pay lost wages that the alien was not entitled to receive in the first place. *Id.* at 149–50. We follow the Supreme Court's explicit "no-backpay" dictate to not "overlook this fact and allow [a court] to award backpay to an illegal alien for [months] of work not performed, for wages that could not lawfully have been earned." *Id.* at 148–49.

But that doesn't mean IRCA preempts the entirety of Torres's backpay award. *Hoffman*'s concern about requiring an employer to pay a backpay remedy to an employee ineligible to earn wages disappears when the employee becomes eligible to work. That's exactly what happened here: Torres obtained authorization to work in the United States in February 2013, just a few months after Precision terminated his employment. Once this happened, *Hoffman*'s fear that awarding backpay would condone and encourage future violations fell away. Torres was entitled to work (and did); he could remain in the United States legally (and did); and he could mitigate damages without "triggering new IRCA violations" (and did). 535 U.S. at 150–51; *cf. Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 903 (1984) ("[I]n computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States."). In short, paying Torres backpay after he became authorized to work does not conflict with IRCA.

Precision's counterargument is unavailing.[1] Precision contends that awarding Torres backpay even for the period he was authorized to work runs counter to *Hoffman* because "discounting the misconduct of illegal alien employees . . . subverts [IRCA]." Appellant Br. 46 (quoting *Hoffman*, 535 U.S. at 149–50). Precision argues that since Torres gave a fraudulent Social Security number on his tax form, any compensation for lost wages would discount Torres's misconduct and thus contravene IRCA.

We do not read *Hoffman* so broadly. The passage that Precision relies on comes in response to a specific argument raised by the respondent in that case. The National Labor Relations Board argued that IRCA should not preempt backpay if the employer was unaware that the employee lacked work authorization. In rejecting that argument, the Supreme Court found "no reason to think that Congress . . . intended to permit backpay where but for an employer's unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading apprehension by immigration authorities." *Hoffman*, 535 U.S. at 149. In other words, the "misconduct" that concerned the Court was the continued effort by an unauthorized worker to seek unlawful employment and to evade detection by immigration authorities. *See also id.* at 150 ("[A]warding backpay . . . condones and encourages *future violations*." (emphasis added)). But after Torres received work authorization in February 2013, there was no longer a threat of future IRCA violations. Thus, a backpay award running from February 2013 onward does not conflict with the federal statute.

---

[1]Precision also says damages are unavailable under Tennessee's doctrine of unclean hands, because Torres provided Precision with a fraudulent Social Security number on a tax form. Precision argues that allowing Torres to recover any damage award "circumvents Tennessee's strong public policies regarding the unlawful fraudulent conduct of illegal aliens." Appellant Br. 39.

The district court considered Precision's unclean hands argument forfeited. *See King v. Taylor*, 694 F.3d 650, 659 (6th Cir. 2012) (reviewing district court ruling on forfeiture for abuse of discretion). We agree.

In any event, Tennessee has made the choice to allow unauthorized workers to recover damages for wrongful termination. *See* Tenn. Code. Ann. § 50-6-102(12)(A); *Torres*, 2014 WL 3827820, at *5–10. And legislatures, not courts, get to make those policy choices. Since Congress chose not to displace Tennessee's choice—except as to backpay—we must honor it.

2.

With these principles in mind, we affirm the majority of Torres's backpay award. In its order, the district court indicated that it awarded backpay only for the period in which Torres was authorized to work. But the backpay award also includes a short period in which Torres remained unauthorized. Thus, we modify the damage award to exclude backpay that accrued during that time. *See Petition of U.S. Steel Corp.*, 479 F.2d 489, 501 (6th Cir. 1973); 5 Am. Jur. 2d Appellate Review § 728 (Feb. 2021 Update) ("An appellate court has the power to increase or decrease an award of damages made by a trial judge, when the record is complete.").

In determining the backpay award, the district court started with Torres's uncontested assertion that he would have earned $89,440 had he remained employed with Precision. But that figure included wages that Torres would have earned in December 2012 and January 2013—after his workers' compensation physician released him for work, but before he was legally authorized to work in the country. Since IRCA preempts backpay damages for these two months, we subtract two months' wages from the backpay award. Based on Torres's annual income at Precision, two months of pay equates to $4,160. Thus, Torres may recover $85,280 in lost wages ($89,440 - $4,160), less his mitigating wages of $43,731.58, which amounts to a total backpay award of $41,548.42.

3.

Remaining, then, is the district court's award of non-economic and punitive damages. The district court awarded Torres $1,000 in compensatory damages for emotional distress. In granting this award, the district court credited Torres's testimony that "he felt stressed, depressed, and frustrated . . . due to the nature of his termination and his interactions with Ms. Norwood and Mr. Momberger." R. 84, Pg. ID 1399. The district court also awarded Torres $50,000 in punitive damages. It found Momberger and Norwood's conduct to be "intentional and malicious" and identified a need to deter employers from engaging in similar conduct. *Id.*

The district court did not base these damages on anything relating to Torres's immigration status. Although IRCA broadly regulates immigration, it does not prohibit all damages arising under the States' various employment laws. Indeed, *Hoffman* spoke only to

No. 20-5492           *Torres v. Precision Indus., Inc.*           Page 12

backpay and expressly noted that other remedies remained available to the Board. *See Hoffman*, 535 U.S. at 152 ("Lack of authority to award backpay does not mean that the employer gets off scot-free.").

Torres's non-backpay damages flow directly from Precision's illegal act under Tennessee law, and they do not require Precision to violate IRCA by paying "wages that could not lawfully have been earned." *Hoffman*, 535 U.S. at 149. Thus, awarding compensatory and punitive damages does not interfere with IRCA's regulation of employment and *Hoffman*'s preclusion of backpay for unauthorized workers. So these damages may stand.

* * *

In sum, we hold that IRCA and *Hoffman* preclude Torres from recovering backpay for the period in which he was an unauthorized alien employee. But IRCA and *Hoffman* do not preclude backpay for the period after Torres obtained work authorization. Nor do they preclude compensatory and punitive damages that are unrelated to Torres's immigration status. Thus, we affirm the district court's judgment as to liability. But we reduce the damages award by $4,160.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 20-5492

RICARDO TORRES,

    Plaintiff - Appellee,

v.

PRECISION INDUSTRIES, INC.,

    Defendant - Appellant.

**FILED**
Apr 22, 2021
DEBORAH S. HUNT, Clerk

Before: GRIFFIN, KETHLEDGE, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Tennessee at Jackson.

    THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

    IN CONSIDERATION THEREOF, it is ORDERED that the district court's judgment as to liability is AFFIRMED, but its damages award is REDUCED by $4,160.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk